1  ERIN J. COX (State Bar No. 267954)
   Erin.Cox@mto.com
2  MARK R. YOHALEM (State Bar No. 243596)
   Mark.Yohalem@mto.com
3  BRANDON E. MARTINEZ (State Bar No. 318749)
   Brandon.Martinez@mto.com
4  MUNGER, TOLLES & OLSON LLP
   350 South Grand Avenue
5  Fiftieth Floor
   Los Angeles, California 90071-3426
6  Telephone:  (213) 683-9100
   Facsimile:   (213) 687-3702
7
   Attorneys for Defendant
8  The Walt Disney Company

9

10                    UNITED STATES DISTRICT COURT

11      CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

12

13
   JEFFREY SCOTT, an individual,          Case No. 2:20-CV-09709-SB-SK
14
                  Plaintiff,              **DEFENDANT THE WALT DISNEY
15                                        COMPANY'S NOTICE OF
             vs.                          MOTION AND MOTION TO
16                                        DISMISS PLAINTIFF'S
   THE WALT DISNEY COMPANY, a             COMPLAINT UNDER FED. R. CIV.
17 Delaware corporation; and DOES 1       P. 12(b)(1) AND 12(b)(6)**
   through 10, inclusive,
18                                        **[Request for Judicial Notice and
                  Defendants.             Declaration of Alexander Myers filed
19                                        concurrently herewith]**

20                                        **Judge:**  Hon. Stanley Blumenfeld, Jr.

21                                        **Date:**    March 26, 2021
22                                        **Time:**    8:30 A.M.
                                          **Place:**   Courtroom 6C
23
                                          **Action Filing Date:** October 22. 2020
24

25

26

27

28

---

DEFENDANT THE WALT DISNEY COMPANY'S MOT. TO DISMISS UNDER FED. R. CIV. P. 12(b)(1) & 12(b)(6)

1    TO PLAINTIFF JEFFREY SCOTT AND HIS COUNSEL OF RECORD:

2    PLEASE TAKE NOTICE that on March 26, 2021, at 8:30 A.M., or as soon

3    thereafter as the matter may be heard, in Courtroom 6C of this Court, located at 350

4    West 1st Street, Los Angeles, California 90012, Defendant The Walt Disney Company

5    ("Defendant" or "Disney") will and hereby does move pursuant to Federal Rules of

6    Civil Procedure 12(b)(1) and 12(b)(6) for an order dismissing the Complaint of

7    Plaintiff Jeffrey Scott on the grounds that this Court lacks subject matter jurisdiction

8    over the action, as Plaintiff lacks standing to bring his sole federal claim for copyright

9    infringement, and moreover that the Complaint fails to state any claim upon which

10   relief can be granted.

11   This Motion is made following the conference of counsel pursuant to Central

12   District Local Civil Rule 7-3, which took place on January 11 and January 22, 2021.

13   This Motion is based on the files, records, and proceedings in this action, this Notice,

14   the following Memorandum of Points and Authorities, Defendant's Request for

15   Judicial Notice ("RJN") and Declaration of Alexander Myers ("Myers Decl.") and

16   accompanying exhibits filed concurrently therewith, the reply memoranda that

17   Defendant intends to file in support of this Motion, the arguments of counsel, and such

18   other matters as may be presented at the hearing on this Motion or prior to the Court's

19   decision.

20

21   DATED:  January 27, 2021          MUNGER, TOLLES & OLSON LLP
22                                     ERIN J. COX
                                       MARK R. YOHALEM
23                                     BRANDON E. MARTINEZ
24

25                                     By:  _____/s/ Erin J. Cox_____
26                                              Erin J. Cox

27                                     Attorneys for Defendant The Walt Disney
28                                     Company

DEFENDANT THE WALT DISNEY COMPANY'S MOT. TO DISMISS UNDER FED. R. CIV. P. 12(b)(1) & 12(b)(6)

# **TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION ...................................................................................... 1

II.  BACKGROUND ...................................................................................... 2

    A.  Jim Henson's Muppets and *Muppet Babies* ................................... 2

    B.  Scott's Work on the Original *Muppet Babies* Series ..................... 3

    C.  Scott Fails to Disclose His Alleged *Muppet Babies* Copyright and Contract as Assets in Bankruptcy. ................................................ 5

    D.  Disney Reboots *Muppet Babies*. ................................................... 6

    E.  Scott Registers a Copyright in the 1984 Bible and Sues Disney. ... 7

III.  Rule 12(b)(1):  The Court Lacks Jurisdiction Because Scott Lacks Standing to Bring His Copyright Claim. .................................................. 7

    A.  Scott Lacks Standing to Pursue a Copyright Claim Based on a Work Made For Hire or an Unauthorized Derivative Work. ............ 8

    B.  Scott Is Judicially Estopped From Asserting His Purported Copyright to the 1984 Production Bible. ..................................... 12

IV.  Rule 12(b)(6):  Scott's Claims Fail as a Matter of Law. ....................... 13

    A.  Scott's Copyright Infringement Claim Fails on Its Merits. ........... 13

        1.  Scott's Alleged Copyright in the 1984 Bible Is Unenforceable. .................................................................. 13

        2.  There Is No Substantial Similarity Between the Protectable Elements of the 1984 Bible and the *Muppet Babies* Reboot. ......... 15

    B.  Scott's Breach of Contract Claim Fails. ....................................... 16

        1.  Scott Is Estopped From Asserting Breach of an Alleged Contract He Failed to Disclose In His Bankruptcy. ................ 16

        2.  The 1990 Storyperson Agreement Superseded Scott's Purported 1983 Contract with Marvel. ............................... 17

        3.  In Any Event, Scott's Theory of a Partially Oral and Partially Written Contract Is Legally Incoherent. .......................... 18

    C.  Scott's Breach of Implied-Contract Claim Fails. .......................... 19

        1.  Scott Has Failed to Plead an Implied Contract. ............... 19

        2.  Scott's Prior Sharing of His Alleged Ideas Destroys Any Consideration for an Implied Contract. ......................... 21

DEFENDANT THE WALT DISNEY COMPANY'S MOT. TO DISMISS UNDER FED. R. CIV. P. 12(b)(1) & 12(b)(6)

# TABLE OF CONTENTS
## (Continued)

**Page**

3. The *Muppet Babies* Reboot Shares No Substantial Similarity to the Ideas Scott Purportedly Pitched in 2016............................. 22

4. Scott's Implied-Contract Claim Is Time-Barred. ........................... 23

D. Scott's Fraud Claim Is Not Pleaded With Particularity. ........................... 24

V. CONCLUSION ................................................................................ 25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DEFENDANT THE WALT DISNEY COMPANY'S MOT. TO DISMISS UNDER FED. R. CIV. P. 12(b)(1) & 12(b)(6)

1

## **<u>TABLE OF AUTHORITIES</u>**

2

<u>Page(s)</u>

3

**FEDERAL CASES**

4
5
*Abdullah v. Walt Disney Co.*,
  2016 WL 5380930 (C.D. Cal. Mar. 14, 2016) ........................................ 16

6
7
*Anderson v. Stallone*,
  1989 WL 206431 (C.D. Cal. 1989) ......................................................... 11

8
9
*Benay v. Warner Bros. Ent.*,
  607 F.3d 620 (9th Cir. 2010) .............................................. 15, 16, 22, 23

10
*Berkic v. Crichton*,
  761 F.2d 1289 (9th Cir. 1985) ................................................... 14, 15, 16

11
12
*Birdsong v. AT&T Corp.*,
  2013 WL 1120783 (N.D. Cal. Mar. 18, 2013) ......................................... 5

13
14
*In re Carthage Tr.*,
  2013 WL 589208 (C.D. Cal. Feb. 14, 2013) .......................................... 17

15
16
*Cavalier v. Random House, Inc.*,
  297 F.3d 815 (9th Cir. 2002) ................................................................. 16

17
18
*Coto Settlement v. Eisenberg*,
  593 F.3d 1031 (9th Cir. 2010) ................................................................. 5

19
20
*Cusano v. Klein*,
  264 F.3d 936 (9th Cir. 2001) ................................................................. 12

21
22
*Daniels v. Walt Disney Co.*,
  958 F.3d 767 (9th Cir. 2020) ................................................... 19, 20, 21

23
*DC Comics v. Towle*,
  802 F.3d 1012 (9th Cir. 2015) ............................................................... 14

24
25
*Funky Films, Inc. v. Time Warner Ent. Co.*,
  462 F.3d 1072 (9th Cir. 2006) ............................................................... 15

26
27
*Hotel Emps. & Rest. Loc. 2 v. Vista Inn Mgmt. Co.*,
  393 F. Supp. 2d 972 (N.D. Cal. 2005) .................................................... 5

28

1
2

## TABLE OF AUTHORITIES
### (Continued)

Page(s)

3
4

*Hsu v. OZ Optics Ltd.*,
  211 F.R.D. 615 (N.D. Cal. 2002) ........................................................... 24

5
6

*J2F Prods. Inc. v. Sarrow*,
  2010 WL 11515282 (C.D. Cal. 2010) ............................................ 12, 17

7
8

*Johnston v. Discover Bank*,
  2011 WL 2420216 (C.D. Cal. 2011) ..................................................... 17

9

*Mirage Editions, Inc. v. Albuquerque A.R.T. Co.*,
  856 F.2d 1341 (9th Cir. 1988) ................................................................ 9

10
11

*Muriu v. W. Coast Life Ins. Co.*,
  2017 WL 10592124 (C.D. Cal. May 25, 2017)...................................... 25

12
13

*Pickett v. Prince*,
  207 F.3d 402 (7th Cir. 2000) ................................................................ 11

14
15

*Quirk v. Sony Pictures Co.*,
  2013 WL 1345075 (N.D. Cal. Apr. 2, 2013).................................... 21, 22

16
17

*Righthaven LLC v. Hoehn*,
  716 F.3d 1166 (9th Cir. 2013) ................................................................ 9

18
19

*Rose v. Beverly Health Rehab. Servs., Inc.*,
  295 Fed.Appx. 142 (9th Cir. 2008) ....................................................... 12

20

*Shame On You Prods. v. Banks*,
  120 F. Supp. 3d 1123 (C.D. Cal. 2015) ................................................ 16

21
22

*Skidmore v. Led Zeppelin*,
  952 F.3d 1051 (9th Cir. 2020) .............................................................. 15

23
24

*Sobhani v. @Radical.Media Inc.*,
  257 F. Supp. 2d 1234 (C.D. Cal. 2003) ................................................ 11

25
26

*Stewart v. Abend*,
  495 U.S. 207 (1990)............................................................................... 13

27
28

*U.S. Auto Parts Network, Inc. v. Parts Geek, LLC*,
  692 F.3d 1009 (9th Cir. 2012) .................................................. 13, 14, 15

1
2

## **TABLE OF AUTHORITIES**
### (Continued)

Page(s)

3
4

*UMG Recordings, Inc. v. Glob. Eagle Ent., Inc.*,
   117 F. Supp. 3d 1092 (C.D. Cal. 2015) ............................................................ 24, 25

5
6

*Vess v. Ciba-Geigy Corp. USA*,
   317 F.3d 1097 (9th Cir. 2003) ........................................................................... 25

7

*VMG Salsoul, LLC v. Ciccone*,
   824 F.3d 871 (9th Cir. 2016) ............................................................................. 23

8
9

*Voss v. Knotts*,
   2012 WL 12846092 (S.D. Cal. May 29, 2012) ................................................ 12, 13

10
11

*Warren v. Fox Family Worldwide, Inc.*,
   328 F.3d 1136 (9th Cir. 2003) ........................................................................... 8, 9

12
13

*Yessup Touring II, LLC v. Baltimore Orioles, Inc.*,
   2005 WL 6124309 (C.D. Cal. Aug. 2, 2005) ................................................... 19

14

S̲TATE̲ C̲ASES̲

15
16

*250 L.L.C. v. PhotoPoint Corp.*,
   131 Cal. App. 4th 703 (2005) ........................................................................... 17

17
18

*Am. Aeronautics Corp. v. Grand Cent. Aircraft Co.*,
   155 Cal. App. 2d 69 (1957) .............................................................................. 18, 19

19
20

*Desny v. Wilder*,
   46 Cal. 2d 715 (1956) ............................................................................ 19, 20, 21, 22

21
22

*Frangipani v. Boecker*,
   65 Cal. App. 4th 860 (1998) ............................................................................. 17

23

*Khajavi v. Feather River Anesthesia Med. Grp.*,
   84 Cal. App. 4th 32 (2000) .............................................................................. 19

24
25

*Spinner v. ABC, Inc.*,
   215 Cal. App. 4th 172 (2013) ........................................................................... 19, 23

26
27

*Take Me Home Rescue v. Luri*,
   208 Cal. App. 4th 1342 (2012) ......................................................................... 18

28

**TABLE OF AUTHORITIES**
(Continued)

**Page(s)**

*Thompson v. Cal. Brewing Co.*,
    191 Cal. App. 2d 506 (1961) ................................................................. 24

*Tremayne v. Striepeke*,
    262 Cal. App. 2d 107 (1968) ................................................................. 17

**FEDERAL STATUTES**

17 U.S.C. § 102(b) ................................................................................... 16

17 U.S.C. § 103(b) ................................................................................... 13

17 U.S.C. § 409(9) ................................................................................... 10

17 U.S.C. § 410(c) ..................................................................................... 8

**STATE STATUTES**

Cal. Civ. Code § 1697 .............................................................................. 17

Cal. Civ. Proc. Code § 339(1) .................................................................. 23

**FEDERAL RULES**

Fed. R. Civ. P. 9(b) .......................................................................2, 24, 25

Fed. R. Civ. 12(b)(1) ..................................................................... 1, passim

Fed. R. Civ. 12(b)(6) ..................................................................... 1, passim

Fed. R. Civ. 12(c) .................................................................................... 17

**TREATISES**

4 Nimmer on Copyright § 19D.07[D] ....................................................... 23

DEFENDANT THE WALT DISNEY COMPANY'S MOT. TO DISMISS UNDER FED. R. CIV. P. 12(b)(1) & 12(b)(6)

1    I.    **INTRODUCTION**

2         Jeffrey Scott did not create Jim Henson's Muppets in the 1950s or the idea of

3    presenting them as babies in a nursery in the 1980s.  Scott concedes that he was only

4    brought on by Marvel Productions Ltd. ("Marvel") to work on the *Muppet Babies*

5    cartoon television show after the concept had already been developed by Henson

6    Associates, Inc. ("HA").  He claims, though, that *Muppet Babies* effectively belongs to

7    him—that Marvel guaranteed him "in perpetuity" "the right to write the script of each

8    new episode produced" as well as royalties and even a screen credit for every episode,

9    "whether or not he wrote it."  (Compl. ¶¶ 3, 19.)[1]

10        At the threshold, Scott's suit must be dismissed under Rule 12(b)(1).  HA

11   authorized development of *Muppet Babies* only on a work-for-hire basis; either that

12   applies to Scott (and he has no copyright claim) or he was working without

13   authorization (and anything he developed was an unauthorized derivative work, which

14   cannot be copyrighted).  Either way, he thus lacks standing to pursue his copyright

15   infringement claim, the only basis for federal jurisdiction.  He is also judicially

16   estopped from claiming copyright because he did not disclose any such asset in his

17   most recent bankruptcy.  This is unsurprising, because there is no way he could have

18   one.  This Court must dismiss under Rule 12(b)(1).

19        The Complaint also requires dismissal under Rule 12(b)(6) for at least four more

20   reasons.  *First*, any purported copyright in Scott's derivative work (in 1984) is

21   unenforceable against the holder of the Muppet copyrights because none of his alleged

22   contributions to the underlying intellectual property are original, copyrightable, and

23   non-trivial, or substantially similar to the *Muppet Babies* series of 2018.

24        *Second*, contrary to his false allegation that he never signed an agreement with

25   Marvel, Scott in fact signed a written, fully integrated contract governing his services

26

27   _____
     [1] Scott sued The Walt Disney Company because in more recent years it has acquired

28   Marvel and the Muppets.

DEFENDANT THE WALT DISNEY COMPANY'S MOT. TO DISMISS UNDER FED. R. CIV. P. 12(b)(1) & 12(b)(6)

1  on the *Muppet Babies* series.  The terms of that agreement refute the alleged rights "in

2  perpetuity" that Scott claims he got from a prior "partly oral and partly in writing"

3  agreement.  The written agreement (incorporated by reference in the Complaint and

4  thus properly considered on a Rule 12(b)(6) motion) explicitly supersedes any

5  purported prior oral/unsigned agreement.

6      *Third*, Scott has failed to plead a viable claim for breach of an implied contract

7  under which Disney would pay him for ideas he allegedly shared with Disney in 2016

8  for the reboot of *Muppet Babies*.  Scott bears the burden of pleading (1) that he

9  disclosed ideas otherwise unavailable to Disney, and (2) that Disney understood it had

10  an obligation to pay him for that disclosure, but all he alleges is that he shared ideas he

11  already disclosed for free or which were already present in the 1984 *Muppet Babies*

12  series.  Moreover, if this is an implied-contract claim, it is time-barred.

13      *Finally*, Scott's promissory-fraud claim does not meet the requirement of Rule

14  9(b) that fraud be pleaded with particularity.  Instead, it is all speculation, "information

15  and belief."

16  **II.    BACKGROUND**

17      **A.  Jim Henson's Muppets and *Muppet Babies***

18      Jim Henson originated his iconic Muppet characters in the 1950s; the Muppets

19  gained a nationwide television audience in the following decades, and appeared on the

20  big screen in motion pictures.  (RJN, Exs. D-1–D-2.)  Their third film, *The Muppets*

21  *Take Manhattan*, was filmed in the summer of 1983.  (*Id.*, Exs. B-2, D-3–D-5.)  The

22  film featured a dream sequence in which the adult Muppet characters—Kermit, Miss

23  Piggy, Gonzo, and others—were shown as toddlers together in a nursery setting,

24  singing and engaging in imaginative adventures.  For instance, while climbing a crib,

25  baby Miss Piggy imagines climbing the Matterhorn.  (*Id.*, Ex. B-2 at 50:51–54:36.)

26      *Muppet Babies*, an animated cartoon television series produced by Marvel from

27  1984 to 1991, expanded on this depiction of the Muppets as babies.  Jim Henson and

28  HA employees developed the show during a brainstorming session on March 10, 1984.

1   (Myers Decl., Ex. B.)  The notes of that meeting (which may be considered for

2   purposes of a Rule 12(b)(1) motion) state that the show would "revolve[] around the

3   Muppet Babies and their relationships with each other," "take[] place in a nursery—a

4   sort of generic nursery," and "all fantasies begin and end in the nursery."  (*Id*. at 2.)

5   "When their nanny or an adult enters the room, they may revert to baby sounds, an

6   obvious change from their usual witty, imaginative, cooperative (or dictatorial)

7   behavior."  (*Id.*)

8      Marvel and HA signed a production agreement governing their co-production of

9   the *Muppet Babies* series, dated March 15, 1984 (this document is also properly

10  considered on a Rule 12(b)(1) motion).  (*Id.*, Ex. A.)  Under the agreement, HA

11  licensed to Marvel, under specified conditions, certain intellectual property for use "in

12  connection with the production of the Series or any Episode thereof," including

13  "copyrighted or otherwise protected characters owned or controlled by HA and known

14  as 'Muppet Babies'" and "the concept for the Series."  (*Id.* § 1.1.)  The agreement

15  provided that "HA shall own all right, title and interest in and to the Series and each

16  Episode thereof," including "each and every character, characterization, depiction, and

17  all other written … elements … ."  (*Id.* § 5.1.)  Marvel, moreover, agreed that all

18  services performed by it or by "all Persons engaged by [Marvel] hereunder and all

19  results and proceeds thereof" would "be considered a work made for hire" and that

20  "[a]ny and all contracts or agreements entered into by [Marvel] with a third Person in

21  connection with the Series or any Episode thereof shall so provide."  (*Id.*)  "[A]s

22  between [Marvel] and HA," the production agreement further provided, "or any Person

23  engaged by [Marvel], only HA shall own and have the right to copyright the same."

24  (*Id.*)  Consistent with this agreement, HA's original copyright registrations for the

25  *Muppet Babies* series note that the author of each script is "Marvel Productions, Ltd.,

26  employer for hire."  (RJN, Exs. E-1 – E-106.)

27  **B.  Scott's Work on the Original *Muppet Babies* Series**

28      Scott alleges that "Marvel obtained [his] services to create a series production

-3-

bible and write scripts for a new Muppet-based television show, depicting the Muppet characters as youngsters." (Compl. ¶¶ 19, 36.)[2]  The bible is dated April 6, 1984, and bears Marvel's and HA's names on the cover page. (*Id.*, Ex. 1.)  The bible explicitly describes its goal as simply repackaging the existing, copyrighted Muppets characters as babies: "THE MUPPET BABIES … are exactly that.  All of those wonderful Muppet characters we've grown to love … as babies." (*Id.* at 2 (original ellipses).)  Each maintained "the unique character traits of their adult selves," and, as in *The Muppets Take Manhattan* and HA's March 1984 brainstorming session notes, carried out imaginary adventures in a children's nursery. (*Id.*)  Some of the language is lifted verbatim from HA's March 1984 brainstorming session notes.[3]

According to Scott, he and Marvel entered into an agreement entitling Scott "in perpetuity" to the option to write the script for each and every *Muppet Babies* episode ever produced; to be paid an additional $3,500 royalty and receive a "Developed for Television by" credit for each episode ever produced; and to be paid $12,000 for each script he elected to write. (Compl. ¶ 19.)  Scott alleges that this "partly oral and partly in writing" contract consisted of both oral promises by Marvel and unspecified terms

---

[2] Scott alleges that his partly oral and partly written agreement with Marvel was entered into in October 1983, which predates the March 1984 production agreement between HA and Marvel under which Marvel was engaged as a producer of the *Muppet Babies* series. Scott's reliance on a purported oral agreement that predates Marvel's engagement as producer of *Muppet Babies* by HA only strengthens the conclusion that Scott's derivative work is unauthorized, if not a work-for-hire made in accordance with the Marvel/HA production agreement.

[3] *Compare, e.g.,* Myers Decl., Ex. B at 2 (March 1984 HA brainstorming session notes) ("KERMIT: as usual, he is the gang leader. He is also the straight man..."), *with* Compl., Ex. 1 at 3 (April 1984 production bible) ("KERMIT… As usual, Kermit is the gang leader (although sometimes overwhelmed by the responsibility of this position). He is also the straight man."); *compare* Myers Decl., Ex. B at 3 ("PIGGY: is cute and sweet and tough—a younger version of her older self. She tells stories in a way that interests (and therefore stars) her."), *with* Compl., Ex. 1 at 4 ("PIGGY… She is cute and sweet and tough—a younger version of her older self.  Piggy tells stories in a way that interests (and therefore stars) her.").

1  in various "proposed written agreements" that Marvel presented to Scott but that he

2  never signed.  (*Id.* ¶ 36.)  Scott alleges that he "never accepted" and "never fully

3  executed" any "written agreements" proposed by Marvel.  (*Id.* ¶ 19.)

4        These allegations are conclusively refuted by a written agreement that the

5  Complaint incorporates by reference.  In 1990, Scott, his loan-out company (Jeffrey

6  Scott Productions, Inc.), and Marvel executed a written storyperson agreement

7  regarding his work on *Muppet Babies*.  (*See* Myers Decl., Ex. C §§ 1, 5.)  (The Court

8  may consider the 1990 storyperson agreement incorporated by reference because it

9  bears dispositively on the validity and terms of Scott's contractual relationship with

10  Marvel and is therefore integral and squarely relevant to his Complaint.[4])  The

11  agreement disproves Scott's claim that he "never accepted" and "never fully executed"

12  any "written agreements" proposed by Marvel regarding his work on *Muppet Babies,*

13  (Compl. ¶ 19), and Scott's failure to attach this executed written agreement "rais[es]

14  the spectre that [Scott] failed to incorporate" the document expressly "in the complaint

15  as a means of avoiding Rule 12(b)(6) dismissal," *Hotel Emps.*, 393 F. Supp. 2d at 979.

16  Having signed the 1990 agreement, including a rider indicating he had reviewed and

17  understood all its terms, Scott cannot dispute its authenticity.  *See Coto Settlement v.*

18  *Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010).

19  
20        ## C.  Scott Fails to Disclose His Alleged *Muppet Babies* Copyright and Contract as Assets in Bankruptcy.

21        In 2003, Scott declared Chapter 7 bankruptcy for the second time.  (*See* RJN,

22  Ex. A.)  Under the heading of "Patents, copyrights, and other intellectual property,"

23  Scott disclosed as assets "[e]ight screenplays" and "[t]wenty-five television series

24  ideas," all of which had "been marketed for sale . . . *without success*."  (*Id.* at 12-13

25  

26  [4] *See Hotel Emps. & Rest. Emps. Loc. 2 v. Vista Inn Mgmt. Co.*, 393 F. Supp. 2d 972,

27  979 (N.D. Cal. 2005); *see also, e.g.*, *Birdsong v. AT&T Corp.*, 2013 WL 1120783, at
   *2 (N.D. Cal. Mar. 18, 2013) (considering agreement releasing plaintiff's claims on

28  motion to dismiss even though not expressly incorporated into complaint because
   plaintiff "would have no valid claims unless the release agreement did not bar them").

1   (italics added).)  Obviously, this category could not include any copyright related to

2   *Muppet Babies*, a very successful television show.  Nowhere in his filings did Scott

3   disclose the alleged perpetual rights of first refusal and to hefty royalties for any use of

4   *Muppet Babies,* even though he scheduled as assets other royalties under the

5   intellectual-property category.  (*Id*.)

6          **D.  Disney Reboots *Muppet Babies*.**

7        In November 2014, Scott allegedly suggested to Lisa Henson, the president of

8   HA (now known as the Jim Henson Company), that Disney "produce new *Muppet*

9   *Babies* shows."  (Compl. ¶ 22.)  Henson connected Scott with a vice president at

10  Disney's Muppets Studio, who purportedly told Scott that Disney was *already*

11  planning to re-release the original *Muppet Babies* series and "expressed interest" in

12  rebooting it, too.  (*Id.* ¶ 23.)  Over a year later, in early 2016, Scott allegedly met with

13  two Disney executives and shared "his ideas" for a *Muppet Babies* reboot.  (*Id.* ¶ 24.)

14       Scott's "new" series was simply the old series using Disney's newer animation

15  technology.  Scott urged: "If it ain't broke, don't fix it!"  (*Id.*, Ex. 3 at 1.)  The "basic

16  structure of the series should remain the same"; "update the animation" to "look[] like

17  a 2017 production" with "Pixar-Disney quality CG," he said, and "revise a few of its

18  elements to make them fit better in today's world."  (*Id.* at 1-3.)  Scott's alleged

19  specific ideas included setting the nursery in a "charming old house" with "art

20  supplies, books, a table," and an "outdoor play area with play equipment"; "making the

21  nanny character younger"; having her socks change between episodes; and "structuring

22  episodes around the Muppet Babies encountering problems in the real world and using

23  their imaginations to explore, amplify, and resolve them."  (*Id.* ¶ 24.)  Scott allegedly

24  gave the Disney executives copies of some of his scripts for the original *Muppet*

25  *Babies* series and a three-page pitch containing his ideas for the reboot.  (*Id.*)  He

26  alleges no other interaction with the Disney executives or involvement in the

27  development or production of the *Muppet Babies* reboot.

28       On March 23, 2018, Disney launched its new, computer-animated *Muppet*

1   *Babies* series.  (*See id.* ¶ 25.)  The new series received extensive media attention and

2   promotion by Disney and its affiliates beginning in October 2016, years before its

3   release.  (*See, e.g.,* RJN, Exs. C-1 – C-12, D-6.)

4                       **E.  Scott Registers a Copyright in the 1984 Bible and Sues Disney.**

5           In late October 2019, three years after Disney's *Muppet Babies* reboot was

6   widely publicized, Scott registered a purported copyright for the 1984 production

7   bible.  (*See* Compl., Exs. 1-2.)  Three months later, on January 31, 2020, Disney

8   agreed to toll the statutes of limitations for any *Muppet Babies*-related claims Scott

9   may have against it until September 4, 2020.  (*Id.* ¶ 25.)  When the parties entered into

10  the tolling agreement at the end of January 2020, the two-year limitations period had

11  already run.  Scott filed this action on October 22, 2020, approximately six weeks after

12  the tolling agreement expired.

13          In this lawsuit, Scott asserts that the reboot of the *Muppet Babies* infringes his

14  purported copyright in the 1984 production bible for the original *Muppet Babies* series

15  and constitutes a breach of the "partly oral and partly in writing" contract he allegedly

16  made with Marvel in connection with his work on that series.  (*See id.* ¶¶ 27-51.)  He

17  also sues for breach of an implied contract allegedly formed in 2016, under which

18  Disney "agreed to pay [him] for the appropriation and use" of the ideas he shared with

19  its executives for the *Muppet Babies* reboot.  (*Id.* ¶¶ 41-47.)  Finally, Scott sues for

20  promissory fraud, contending that Disney's executives "represented that [Disney]

21  would pay and credit him for his ideas for the reboot and [would] consider offering

22  him an opportunity to work on the reboot" but in fact had no intention of doing so.  (*Id.*

23  ¶¶ 48-51.)

24  **III.   Rule 12(b)(1):  The Court Lacks Jurisdiction Because Scott Lacks Standing**

25  **      to Bring His Copyright Claim.**

26          For two independent reasons, Scott lacks standing to claim a copyright in the

27  1984 *Muppet Babies* production bible and, as a result, this Court lacks subject-matter

28  jurisdiction over Scott's sole federal claim, warranting dismissal of the entire lawsuit

1   under Rule 12(b)(1).  A party may seek dismissal under Rule 12(b)(1) "either on the

2   face of the pleadings or by presenting extrinsic evidence."  *Warren v. Fox Family*

3   *Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003).  "[I]f [plaintiff] lacks standing

4   to assert his federal copyright claims, the district court d[oes] not have subject matter

5   jurisdiction and dismissal [i]s appropriate."  *Id.* at 1140.

6          *First*, in light of the terms of the production agreement that placed conditions on

7   HA's licensing of *Muppet Babies* intellectual property for purposes of developing the

8   cartoon show, Scott's work on the *Muppet Babies* bible can only be either (a) a work

9   for hire (in reality) or (b) an unauthorized derivative work (if one accepts Scott's

10  allegations that his agreement with Marvel granted him intellectual-property interests

11  in the *Muppet Babies*).  In either case, Scott lacks standing to claim copyright.[5]

12  *Second*, Scott is judicially estopped from asserting any copyright relating to his work

13  on *Muppet Babies* (including in the 1984 production bible) because he did not include

14  such a copyright among his assets in his 2003 bankruptcy.

15      **A.**    **Scott Lacks Standing to Pursue a Copyright Claim Based on a Work**
16                  **Made For Hire or an Unauthorized Derivative Work.**

17          Scott lacks standing to bring his copyright-infringement claim based on the 1984

18  bible because it was either a work made for hire or an unauthorized derivative work.

19  The reality—as reflected in the 1990 storyperson agreement, the contemporaneous

20  copyright registrations, and HA's production agreement with Marvel—is that Scott's

21  work was a work made for hire.  That is why Scott's bogus claim rests on a "partly

22  oral, partly in writing" agreement documented nowhere, and why he included none of

23

24  _____

25  [5] Although copyright registration certificates obtained within five years of first
    publication of the underlying work are prima facie evidence of the validity of the
26  copyright and the facts stated therein, including ownership, Scott obtained his
    copyright registration nearly 40 years after he wrote the bible, and it is not entitled to a
27  presumption of validity. 17 U.S.C. § 410(c).  By contrast, HA's original copyright
    registrations for the *Muppet Babies* series in the 1980s do constitute prima facie
28  evidence of ownership and the facts stated therein.

1   these key documents with his Complaint.  In *Warren,* the Ninth Circuit affirmed

2   dismissal under Rule 12(b)(1) of copyright claims based on the district court's

3   consideration of contracts that showed that the works in which the plaintiff claimed

4   copyright had been "works made for hire," such that the plaintiff lacked standing to

5   sue.  328 F.3d at 1140-41; *see also Righthaven LLC v. Hoehn*, 716 F.3d 1166, 1170

6   (9th Cir. 2013) (affirming dismissal of copyright infringement suit on Rule 12(b)(1)

7   motion for lack of standing where plaintiff held no beneficial rights to allegedly

8   infringed work under relevant contracts).  So too here.

9        But if, as Scott contends, his work on the 1984 production bible was not a work

10  for hire, then it necessarily was an unauthorized derivative work, which likewise

11  deprives Scott of standing.  A "derivative work" is one which "would be considered an

12  infringing work if the material which it has derived from a preexisting work had been

13  taken without the consent of the copyright proprietor of such preexisting work."

14  *Mirage Editions, Inc. v. Albuquerque A.R.T. Co.,* 856 F.2d 1341, 1343 (9th Cir. 1988)

15  (citations omitted).  HA, not Marvel, was the "copyright proprietor" of the Muppet and

16  Muppet Babies characters, as well as the premise of the Muppets as babies in a nursery

17  with overactive imaginations—as depicted in *The Muppets Take Manhattan* and HA's

18  brainstorming session notes.  (*See* RJN, Ex. B-2 at 50:51–54:36; Myers Decl., Ex. B.)

19  The *Muppet Babies* production bible is a quintessential derivative work derived from

20  the pre-existing Muppet characters.  Its very introduction begins:  "THE MUPPET

21  BABIES … are exactly that.  All of those wonderful Muppet characters we've grown

22  to love … as babies….  Picture a wild and zany nursery filled with these baby

23  Muppets, each with the unique character traits of their adult selves…."  (Compl., Ex. 1

24  at 2.)  And indeed, even in his October 2019 registration of the *Muppet Babies*

25  production bible—a registration carried out with this litigation in mind—Scott

26

27

28

1   "exclude[s]" any claim to the preexisting "Muppet characters." (*Id.,* Ex. 2.)[6]

2      For Scott's development of the production bible to be anything *other* than

3   infringement would therefore require HA's consent. The Complaint alleges no

4   agreement between Scott and HA, only one between "Scott and Marvel." (Compl.

5   ¶ 36; s*ee also, e.g., id.* ¶¶ 3, 19.) Marvel, of course, did not own the copyright to the

6   Muppet characters; HA did. Any authorization Marvel could give Scott was thus a

7   sublicense to what Marvel and HA agreed; and that agreement, dated March 15, 1984,

8   is unambiguous that any work performed by Marvel or anyone engaged by Marvel

9   would be work made for hire. (*See* Myers Decl., Ex. A §§ 1.1, 5.1.)

10     *First*, the "Licensed Elements" from HA include the "copyrighted or otherwise

11  protected characters . . . known as 'Muppet Babies'" as well as "the concept for the

12  Series." (*Id.* § 1.1.) *Second*, the production agreement expressly provides that "HA

13  shall own all right, title and interest in an to the Series and each Episode thereof,"

14  including "each and every character, characterization, depiction, and all other written,

15  musical or other soundtrack elements." (*Id.* § 5.1.) *Third*, Marvel "acknowledges that

16  the services to be performed by [Marvel] and all Persons engaged by [Marvel]

17  hereunder and all results and proceeds thereof are works specially ordered or

18  commissioned for use as a contribution to a motion picture or other audio visual work

19  and that all such services, results and proceeds thereof shall be considered a work

20  made for hire. *Any and all contracts or agreements entered into by [Marvel] with a*

21  *third Person in connection with the Series or any Episode thereof shall so provide*."

22  (*Id.*, emphasis added). *Finally*, Marvel "further agrees and acknowledges that HA is

23  the Person for whom all work pursuant to this Agreement is and will be prepared and

24  that HA shall be considered the author for purposes of copyright and shall own all the

25  _____

26  [6] The Copyright Act requires an application for a derivative work to identify "any preexisting work or works that it is based on or incorporates, and a brief, general

27  statement of the additional material covered by the copyright claim being registered." 17 U.S.C. § 409(9). The "[n]ew material included in claim" according to Scott's

28  registration is, simply, "text." (Compl., Ex. 2.)

rights comprised in and to the copyright of such work and each Episode and that, *as between [Marvel] and HA, or any Person engaged by [Marvel], only HA shall own and have the right to copyright the same* and that HA may copyright the same in HA's name or the name of its nominee(s)." (*Id.*, emphasis added.)

Under no circumstances could Marvel authorize Scott to develop the Muppet Babies as his own copyrightable work. Thus, if—as Scott falsely alleges—Marvel did *not* enter into a work-for-hire arrangement with him, then his use of HA's copyrighted material was unauthorized and his work was an unauthorized derivative work—one "pervaded" by copyrighted characters belonging to HA. In this scenario, Scott cannot claim copyright. No jurisdiction permits the author to claim copyright over an unauthorized derivative work "'if the pre-existing work tends to pervade the entire derivative work.'" *Sobhani v. @Radical.Media Inc.*, 257 F. Supp. 2d 1234, 1239-40 (C.D. Cal. 2003) (quoting 1 Nimmer on Copyright § 3.06). Some jurisdictions go farther still and hold that the author of an unauthorized derivative work can claim copyright protection in *no part* of that work. *E.g.*, *Pickett v. Prince*, 207 F.3d 402, 406 (7th Cir. 2000) ("A derivative work is, by definition, bound to be very similar to the original. Concentrating the right to make derivative works in the owner of the original work prevents what might otherwise be an endless series of infringement suits posing insoluble difficulties of proof.").

Under either approach to an unauthorized derivative work, Scott lacks a valid copyright. Just as the Jack-in-the-Box character "Jack" pervaded the commercials in *Sobhani*, *id.* at 1239, and the Rocky characters pervaded the spec script in *Anderson v. Stallone*, 1989 WL 206431, at *8 (C.D. Cal. Apr. 25, 1989), so too do the Muppet characters indisputably pervade the 1984 show bible, precluding any claim to copyright protection by Scott. As the production bible puts it: "THE MUPPET BABIES … are exactly that. All of those wonderful Muppet characters we've grown to love … as babies." (Compl. Ex. 1 at 2 (original ellipses).) Scott cannot claim a copyright even on his own theory.

### B.   Scott Is Judicially Estopped From Asserting His Purported Copyright to the 1984 Production Bible.

Scott is also judicially estopped from claiming copyright in the 1984 production bible because he failed to disclose the copyright as an asset in his 2003 bankruptcy petition.  Scott "had an affirmative duty to schedule his alleged copyright as an asset when he filed for bankruptcy."  *Voss v. Knotts*, 2012 WL 12846092, at *2 (S.D. Cal. May 29, 2012).  "If [a debtor] fail[s] properly to schedule an asset ... that asset continues to belong to the bankruptcy estate and d[oes] not revert to [the debtor]."  *Cusano v. Klein*, 264 F.3d 936, 945-46 (9th Cir. 2001).  Failure to disclose a copyright in bankruptcy proceedings thus estops the debtor from later suing on that copyright.  "[J]udicial estoppel ensures that debtors make a 'full and honest disclosure' of their assets in the original bankruptcy proceeding."  *Rose v. Beverly Health & Rehab. Servs., Inc.*, 295 F. App'x 142, 144 (9th Cir. 2008).

An analogous instance of judicial estoppel can be found in *J2F Productions Inc. v. Sarrow*, 2010 WL 11515282 (C.D. Cal. Nov. 16, 2010).  There, the plaintiff had "failed to include the 2003 oral contract [with the defendant] as an asset" in his 2005 bankruptcy and had been granted discharge by the bankruptcy court.  *Id.* at *4.  As a result, the plaintiff was "judicially estopped from (1) bringing any claim against [defendant] arising out of the 2003 oral contract or (2) deriving any ownership rights in [defendant's] Film or the Film's copyright based on the 2003 oral contract."  *Id.*

Here, Scott's bankruptcy filings listed as (worthless) assets eight screenplays marketed for sale "without success," and twenty-five "television series ideas" marketed for sale "without success."  (RJN, Ex. A at 12-13.)  Scott did not disclose any copyright to the 1984 *Muppet Babies* bible; this makes sense because Scott never had any such copyright.  But even if he did have such a copyright, "[b]y failing to properly schedule his alleged copyright asset, the copyright asset continues to belong to the bankruptcy estate and did not revert to [Scott]."  *Voss*, 2012 WL 12846092, at *2.  Scott thus lacks standing to assert the copyright in this lawsuit.

1    **IV.    Rule 12(b)(6):  Scott's Claims Fail as a Matter of Law.**

2           **A. Scott's Copyright Infringement Claim Fails on Its Merits.**

3           Even were the Court to hold that Scott has standing to bring his copyright claim,

4    and is not judicially estopped from asserting infringement, the claim would fail as a

5    matter of law for two reasons:  (1) any protectable derivative contributions to the

6    *Muppet Babies* franchise in the 1984 bible are so meager that Scott's alleged copyright

7    over it is unenforceable against the owner of the Muppets intellectual property, and

8    (2) taken as a whole, those minimal contributions are not substantially similar to

9    Disney's *Muppet Babies* reboot, taken as a whole.

10          **1.    Scott's Alleged Copyright in the 1984 Bible Is Unenforceable.**

11          Even if Scott's registration of his alleged copyright in the 1984 bible is valid—

12   which, as explained above, it is not—Scott's contributions to the preexisting Muppets

13   and Muppet Babies intellectual property belonging to HA were so trivial as to render

14   his purported copyright unenforceable against Disney, the owner of the intellectual

15   property in the Muppets characters.  "[W]here the copyright owner has authorized a

16   third party to prepare a derivative work based on the owner's pre-existing work,

17   copyright protection in the derivative work will cover only 'the material contributed by

18   the author of such work, as distinguished from the preexisting material employed in

19   the work.'"  *U.S. Auto Parts Network, Inc. v. Parts Geek, LLC*, 692 F.3d 1009, 1016

20   (9th Cir. 2012) (quoting 17 U.S.C. § 103(b)).  To be copyrightable, "(1) 'the original

21   aspects of a derivative work must be more than trivial' and (2) 'the original aspects of

22   [the] work must … not in any way affect the scope of any copyright protection in that

23   preexisting material.'"  *Id.* (internal quotation marks omitted).[7]

24

25

26   _____
     [7] *See also Stewart v. Abend,* 495 U.S. 207, 223 (1990) ("The aspects of a derivative

27   work added by the derivative author are that author's property, but the element drawn
     from the pre-existing work remains on grant from the owner of the pre-existing

28   work.").

DEFENDANT THE WALT DISNEY COMPANY'S MOT. TO DISMISS UNDER FED. R. CIV. P. 12(b)(1) & 12(b)(6)

1    Scott cannot claim copyright over the bible's description of "those wonderful

2    Muppet characters we've grown to love … as babies" with all "the unique character

3    traits of their adult selves." (Compl., Ex. 1 at 2.)  Not only was this "Muppets as

4    babies" concept already developed by Jim Henson and HA before Scott was

5    approached by Marvel, but to allow Scott such a derivative copyright would

6    unlawfully diminish "the scope of [Disney's] copyright" over the original Muppet

7    characters on which the Muppet Babies are indisputably based. *U.S. Auto,* 692 F.3d at

8    1016.  Scott's 2019 registration of the bible correctly concedes as much.  (*See* Compl.,

9    Ex. 2 (excluding "Muppet characters" from registration).)  The Muppet Babies are

10   exactly the kind of character "derived from [another's] underlying work" that the

11   Ninth Circuit has held lack "any independently copyrightable elements that would not

12   'affect the scope of any copyright protection in that preexisting material.'" *DC Comics*

13   *v. Towle*, 802 F.3d 1012, 1025 (9th Cir. 2015) (quoting *Parts Geek*, 692 F.3d at 1016).

14        Nor can Scott claim copyright over the 1984 bible's description of the show's

15   setting or premise of imaginary adventures, which are (1) *scenes-a-faire* that flow from

16   the idea of depicting the Muppets as babies or (2) "[g]eneral plot ideas … not protected

17   by copyright law." *Berkic v. Crichton*, 761 F.2d 1289, 1293 (9th Cir. 1985).  (*See*

18   Compl. ¶ 21.)  Moreover, HA had already presented the Muppets as babies in a toy-

19   filled nursery, and depicted them ideating and singing about imaginary adventures, in

20   *The Muppets Take Manhattan*—the production of which preceded Scott's preparation

21   of the 1984 production bible.  Indeed, *The Muppets Take Manhattan* featured (a) the

22   Muppets as babies (b) in a nursery (c) singing a musical number (d) accompanied by

23   the character Rowlf's piano while (e) sharing an imaginative fantasy (f) in which

24   another character pretends to be a mountain climber, (*see* RJN, Ex. B-2 at 50:51–

25   54:36), a scenario Scott simply copied into the 1984 *Muppet Babies* bible, (*see* Compl.,

26   Ex. 1 at 18-23, 24-25, 28).  When its unoriginal and otherwise nonprotectable elements

27   are filtered out, what ideas remain in the 1984 bible are so trivial that Scott's purported

28   copyright is unenforceable as a matter of law. *U.S. Auto,* 692 F.3d at 1016 ("[T]he

1  original aspects of a derivative work must be more than trivial." (citation omitted)).

2        **2.**      **There Is No Substantial Similarity Between the Protectable**

3        **Elements of the 1984 Bible and the *Muppet Babies* Reboot.**

4        Even were the Court to hold that Scott can claim copyright in the bible as a

5  work, his copyright claim nonetheless fails for lack of substantial similarity between

6  the bible's protectable elements and the *Muppet Babies* reboot as a whole.

7        To prevail on his infringement claim, Scott must plead and prove that, after "an

8  objective comparison of specific expressive elements," "the protectable elements [of

9  the purportedly infringed work], standing alone, are substantially similar" to the

10  purportedly infringing work in "plot, themes, dialogue, mood, setting, pace, characters,

11  and sequence of events."  *Benay v. Warner Bros. Ent.*, 607 F.3d 620, 624 (9th Cir.

12  2010), *overruled on other grounds by Skidmore v. Led Zeppelin*, 952 F.3d 1051, 1065-

13  69 (9th Cir. 2020).  In performing this substantial-similarity analysis, the Court must

14  "filter out and disregard the non-protectable elements" of the allegedly infringed work.

15  *Funky Films, Inc. v. Time Warner Ent. Co.*, 462 F.3d 1072, 1077 (9th Cir. 2006),

16  *overruled on other grounds by Skidmore*, 952 F.3d at 1065-69.  The inquiry

17  "compares[] not the basic plot ideas … but the actual concrete elements that make up

18  the total sequence of events and the relationships between the major characters."  *Id.*

19  (quoting *Berkic*, 761 F.2d at 1293).  The inquiry is "fact-specific" but "may often be

20  decided as a matter of law."  *Benay*, 607 F.3d at 624.

21        Scott has failed to identify *any* specific elements in the 1984 production bible

22  that are protectable and nontrivial, let alone any that bear an "articulable similarity" to

23  an element of the *Muppet Babies* reboot.  *See Benay*, 607 F.3d at 624.  Scott

24  specifically claims credit for having originated the *Muppet Babies*' "mix of

25  entertainment and education" and its depiction of "fantasies and adventures that spring

26  from the characters' imaginations."  (Compl. ¶ 21.)  As noted, these ideas for the

27  Muppet Babies were not original to Scott, but even if they were, "[g]eneral plot

28  ideas are not protected by copyright law," *Berkic*, 761 F.2d at 1293, and both are

-15-

1   "themes that are staples of literature," *Cavalier v. Random House, Inc.*, 297 F.3d 815,

2   823 (9th Cir. 2002).  A nursery presided over by "an adult woman who looks after the

3   Muppet Babies" and is much taller than these babies (i.e., the "Nanny" character),

4   (Compl., Ex. 1 at 14), "flow[s] directly from the basic premise of" a show about a

5   group of unrelated babies spending time together; such elements are nonprotectable

6   *scenes a faire*.  *Shame On You Prods. v. Banks*, 120 F. Supp. 3d 1123, 1151-52 (C.D.

7   Cal. 2015); *see also, e.g.*, *Abdullah v. Walt Disney Co.*, 2016 WL 5380930, at *7 (C.D.

8   Cal. Mar. 14, 2016) ("A castle with guards is a *scene a faire* in fairy tales.").  Indeed,

9   the bible itself refers to this as a "generic nursery" setting.  (Compl., Ex. 1 at 24.)

10   Nor can Scott copyright the idea of babies exploring their creativity through

11   "fantasies and adventures that spring from the characters' imaginations …, often

12   taking them to new environments."  (*Id.* ¶ 21.)  "Copyright law only protects

13   expression of ideas, not the ideas themselves."  *Cavalier*, 297 F.3d at 823 (citing 17

14   U.S.C. § 102(b)).  And the Ninth Circuit has specifically held that "the use of 'magical

15   adventures,' a stock plot device, [is not] protect[a]ble."  *Id.* at 828.  Once *all*

16   nonprotectable elements of the bible are properly filtered out, Scott can point to no

17   "articulable similarities" sufficient to establish substantial similarity between the works

18   as a whole, rather than passing similarities between selected elements of both.  *Benay*,

19   607 F.3d at 624.  The claim should therefore be dismissed with prejudice.

20   ## B. Scott's Breach of Contract Claim Fails.

21   Bankruptcy estoppel, a fully integrated written agreement, and a lack of mutual

22   assent all preclude Scott's claim of a "partly oral and partly in writing" agreement

23   entitling him to a development credit, payment, and "the right to write the script of

24   each new [*Muppet Babies*] episode produced," "in perpetuity."  (Compl. ¶¶ 19, 36.)

25   Each of these grounds requires dismissal with prejudice.

26   ### 1.   Scott Is Estopped From Asserting Breach of an Alleged Contract He Failed to Disclose In His Bankruptcy.

27   For the same reason Scott is judicially estopped from asserting any purported

28   copyright to the *Muppet Babies* bible (*see* Part III.B *supra*), he is also estopped from

-16-

asserting a perpetual contractual royalty right: he failed to declare any such right as an asset during his 2003 bankruptcy.  *See Johnston v. Discover Bank*, 2011 WL 2420216, at *2 (C.D. Cal. June 16, 2011) (dismissing under Rule 12(c), as 12(b)(6) equivalent, based on bankruptcy records and estoppel); *Sarrow*, 2010 WL 11515282, at *4.

### 2.    The 1990 Storyperson Agreement Superseded Scott's Purported 1983 Contract with Marvel.

Scott's implausible "partly oral and partly in writing," unexecuted agreement, if it ever existed, was superseded by the 1990 fully executed and integrated storyperson agreement between Scott, his loan-out company, and Marvel.  (*See* Decl., Ex. C.)  The 1990 agreement provides that it "contains the entire understanding of the parties as to the subject matter [t]hereof"; that it supersedes "all prior agreements as to such subject matter"; and that it "may not be amended except by a written waiver signed by the parties."  (*Id.*)  "Where there is an inconsistency between two agreements both of which are executed by all of the parties, the later contract supersedes the former." *Frangipani v. Boecker*, 64 Cal. App. 4th 860, 863 (1998).[8]  The 1990 agreement is inconsistent with the alleged key terms of the implausible, earlier, unexecuted, partly oral contract.

The 1990 agreement was signed by Scott, Scott's loan-out company, and Marvel, and included an integration clause recognized by California precedent, (Myers Decl., Ex. C at 3, 12; *id.* § 16(f)-(g); *see 250 L.L.C. v. PhotoPoint Corp.*, 131 Cal. App. 4th 703, 725 (2005)).  The agreement provided that $13,500 per script was Scott's "full compensation" and that he would "not be entitled to any additional compensation in connection with … use and/or exploitation" of his work "unless such is expressly

---

[8] *See also Tremayne v. Striepeke*, 262 Cal. App. 2d 107, 114 (1968) ("[A] later instrument supersedes an earlier one whenever they are inconsistent."); *In re Carthage Tr.*, 2013 WL 589208, at *7 (C.D. Cal. Feb. 14, 2013) (two contracts that "came later in time ... would supersede [an] original"); *see also* Cal. Civ. Code § 1697 ("A contract not in writing may be modified in any respect by consent of the parties, in writing ... and is extinguished thereby to the extent of the modification.").

provided for in this Agreement."  (Myers Decl., Ex. C §§ 5, 7.)  Further, Marvel was "not obligated to use [Scott's] services," and the $13,500 would "fully discharge" any obligations to him.  (*Id.* § 15.)  These terms flatly contradict Scott's allegations that he had an agreement with Marvel that *required* Marvel to permit him to write every script and to pay him a $3,500 royalty for each new *Muppet Babies* episode "in perpetuity." (Compl. ¶ 19.)  The written agreement controls because a party may not rely on a purported prior agreement to contradict the terms of an integrated written one.  *See Take Me Home Rescue v. Luri*, 208 Cal. App. 4th 1342, 1351-52 (2012).  Scott's failure to mention the 1990 agreement—indeed, his affirmative pleading that he *never* accepted or signed any written agreement with Marvel (Compl. ¶ 19)—is a tacit admission that the 1990 agreement disposes of this claim.

### 3.   In Any Event, Scott's Theory of a Partially Oral and Partially Written Contract Is Legally Incoherent.

Even if the Court were to permit Scott to go forward with alleging a "partly oral and partly in writing" agreement that he never disclosed in bankruptcy and which is directly contradicted by a signed contract he falsely says does not exist, his allegations show a lack of mutual assent to the made-up partly written contract.  (*See* Compl. ¶ 36.)  Mutual assent requires "[a]n acceptance" that "meet[s] exactly, precisely, and unequivocally the terms proposed in the offer."  *Am. Aeronautics Corp. v. Grand Cent. Aircraft Co.*, 155 Cal. App. 2d 69, 79 (1957), *superseded on other grounds by statute*. Scott's allegations, if true, would disprove rather than prove unequivocal mutual assent.

California law does not permit a party to claim that rejected written contracts were selectively incorporated into an oral agreement.  Here Scott alleges that he "never accepted" any of Marvel's "proposed draft written agreements."  (Compl. ¶ 19.)  If so, that means "the proposed written contract was of no force or effect," not that selective "terms [that] were added in the writing [that] was never signed" can be folded into an alleged "oral agreement [that] was not reduced to writing."  *See Am. Aeronautics*, 155

-18-

Cal. App. 2d at 82-83; *see also Khajavi v. Feather River Anesthesia Med. Grp.*, 84 Cal. App. 4th 32, 59-63 (2000); *Yessup Touring II, LLC v. Baltimore Orioles, Inc.*, 2005 WL 6124309, at *4 (C.D. Cal. Aug. 5, 2005).  On its own terms, Scott's alleged hybrid agreement cannot support a plausible claim for an enforceable agreement under California law.

### C. <u>Scott's Breach of Implied-Contract Claim Fails.</u>

Controlling precedent forecloses Scott's third cause of action, a "*Desny* claim" for breach of an implied-in-fact contract purportedly entitling him to compensation for allegedly disclosing ideas for the *Muppet Babies* reboot to Disney in 2016.  To prevail, Scott must plead and prove that: (1) he "clearly conditioned the submission of [his] ideas on an obligation to pay for any use of [his] ideas"; (2) Disney, "knowing this condition before [Scott] disclosed the ideas, voluntarily accepted the submission of the ideas"; and (3) Disney "found the ideas valuable and *actually used* them—that is, [Disney] based [its] work substantially on [Scott's] ideas, rather than on [its] own ideas or ideas from other sources."  *Spinner v. ABC, Inc.*, 215 Cal. App. 4th 172, 184 (2013) (emphasis in original); *see generally Desny v. Wilder*, 46 Cal. 2d 715 (1956).  Scott cannot plead these elements conclusorily with "bare allegations, stripped of relevant details"; he must plead both "details" and "dates."  *Daniels v. Walt Disney Co.*, 958 F.3d 767, 775 (9th Cir. 2020).

### 1. Scott Has Failed to Plead an Implied Contract.

Scott has not pleaded facts that can support an implied contract.  "The Ninth Circuit has developed a multi-part test to evaluate *Desny* claims," under which the plaintiff must plead with "relevant details" that:

> (1) the plaintiff prepared or created the work in question,
> (2) the work was disclosed to the defendant for sale, and
> (3) the disclosure was made under circumstances from which it could be concluded that the offeree voluntarily accepted the disclosure knowing the conditions on which it was tendered and the reasonable value of the work.

*Daniels*, 958 F.3d at 774 (internal quotation marks omitted).  In *Daniels,* the Ninth

1    Circuit held that a plaintiff had failed to plead a *Desny* claim even though she had

2    alleged meetings with specific Disney executives at which, consistent with "customs

3    and practices in the entertainment industry," she disclosed her ideas.  *Id.* at 769, 774-

4    75.  "[T]he existence of a conversation in which an idea is disclosed," the Court held,

5    is "by itself[] an insufficient basis to support an implied-in-fact contract."  *Id.* at 774-

6    75.  The Court affirmed the *Desny* claim's dismissal because "bare allegations,

7    stripped of relevant details," that Disney "accepted the disclosure of [the plaintiff's]

8    ideas … with an expectation that it would have to compensate [her] if Disney+Pixar

9    used [them]" failed to set forth detailed "circumstances from which it could be

10   concluded that [Disney] voluntarily accepted the disclosure knowing the conditions on

11   which it was tendered and the reasonable value of the work."  *Id.*

12       The allegations in Scott's complaint are indistinguishable from those at issue in

13   *Daniels*:  bare allegations that when Scott presented his ideas for a *Muppet Babies*

14   reboot to Disney in 2016, there was an "understanding on both sides that, if Disney

15   used [his] ideas and produced new episodes, it would pay for [his] ideas and honor the

16   commitments that Disney's predecessor, Marvel, and Jim Henson, made to him."

17   (Compl. ¶ 8.)  Scott offers no details from which it could be concluded that Disney

18   "voluntarily accepted the disclosure knowing the conditions on which it was tendered

19   and the reasonable value of the work."  *Daniels*, 958 F.3d at 774.  Scott does not allege

20   whether, much less how, the Disney executives would have been aware of the contours

21   of the purported "commitments" made to him by Marvel or Jim Henson in the early

22   1980s, nor how those purported commitments would translate into a valuation of his

23   ideas for a reboot.[9]  Scott's generalized and conclusory allegations are an "insufficient

24   basis to support an implied-in-fact contract."  *Id.*

25   _____

26   [9] Nor does Scott articulate which elements of his supposed "implied in fact contract"
     with Disney were in fact implied and which were based on the unspecified "express"
27   "representations and warranties" regarding compensation to which his Complaint
     contradictorily refers.  (*See* Compl. ¶¶ 42, 44.)
28

1

**2.    Scott's Prior Sharing of His Alleged Ideas Destroys Any Consideration for an Implied Contract.**

2

3        Scott bears the burden of showing that he clearly conditioned the disclosure of

4   his alleged ideas for the *Muppet Babies* reboot on compensation, but his allegations do

5   precisely the opposite.  "The idea man who blurts out his idea without having first

6   made his bargain has no one but himself to blame for the loss of his bargaining

7   power," and the "law will not in any event, from demands stated subsequent to the

8   unconditioned disclosure of an abstract idea, imply a promise to pay for the idea, for its

9   use, or for its previous disclosure."  *Desny,* 46 Cal. 2d at 739.  Only if he withheld "the

10  disclosure of ideas" until *after* entering an agreement can a plaintiff claim he was

11  offering "consideration for the implied promise to pay."  *Quirk v. Sony Pictures Ent.*

12  *Inc.*, 2013 WL 1345075, at *12 (N.D. Cal. Apr. 2, 2013).

13       The idea of rebooting *Muppet Babies* was "otherwise freely available to"

14  Disney.  *Quirk*, 2013 WL 1345075, at *12.  According to Scott, "[i]n 2014, [he]

15  suggested to Disney that it produce new episodes of the *Muppet Babies*" after

16  disclosing this same idea to the president of the Jim Henson Company.  (Compl. ¶¶ 7,

17  22-23.)  Scott does not allege that there was any limit on the use of this idea or that any

18  implied contract arose from *that* disclosure; these allegations foreclose a *Desny* claim

19  based on Scott's 2016 re-sharing of the idea for a reboot with Disney.

20       To the extent Scott's implied-contract claim is based on the specific details in

21  his 2016 pitch for the reboot, that claim fails because Scott had already disclosed those

22  ideas to Disney in the 1984 bible and scripts for the original series.  Scott's 2016 pitch

23  document begins with the bold and italicized slogan "*If it ain't broke, don't fix it!*" and

24  proceeds to make clear that the reboot would simply reiterate elements from 32 years

25  earlier:

26   •   "[I]t is only necessary to update the animation so that it looks like a 2017
         production, and revise a few of its elements to make them fit better in today's
27       world."

28   •   "The basic structure of the series should remain the same …. This is what made
         the original series a classic and should not be changed."

-21-

- "As before, all of our stories will take place in the Muppet Babies' imaginations."
- "[The Babies] should not be redesigned, but simply modeled in CG to look as closely like the original 2d characters as possible …. Like the Babies, their home should also be upgraded from 2D to rich, Pixar-Disney quality CG."
- "We can keep [the nanny character] visible from the socks down as before."

(Compl., Ex. 3 at 1-3.)  Because all of these ideas were "otherwise freely available to" Disney, their disclosure could not have been consideration for any implied contract in 2016.  *Quirk*, 2013 WL 1345075, at *12.

### 3.    The *Muppet Babies* Reboot Shares No Substantial Similarity to the Ideas Scott Purportedly Pitched in 2016.

Scott's implied-contract claim fails for yet another reason:  as a matter of law, the new and different ideas he supposedly pitched to Disney in 2016 bear no substantial similarity to Disney's *Muppet Babies* reboot.  To prevail on a *Desny* claim, a plaintiff must plead and prove "substantial similarity between [the] plaintiff's idea and [the] defendant's production to render [the] defendant liable."  *Benay*, 607 F.3d at 631 (internal quotation marks omitted).  Because the only ideas that can form the consideration are those that were not already known to Disney in 2016, *Desny,* 46 Cal. 2d at 739, and because "copying less than substantial material is non-actionable," *Benay* 607 F.3d at 631, Scott has the burden of showing that Disney's reboot is substantially similar to *new* ideas that Scott allegedly disclosed in 2016.

Here, as explained above (*see* Part IV.A.2 *supra*), the vast majority of the ideas Scott purportedly pitched to Disney in 2016 were either already featured in the original series or contained in the production bible compiled in 1984.  Of the ideas in Scott's 2016 pitch materials that were conceivably new and different, moreover, Scott has failed to plausibly allege, as he must, that Disney "actually used them" in the reboot— that is, "based [its] work substantially on [his] ideas, rather than on [its] own ideas or ideas from other sources," *Spinner,* 215 Cal. App. 4th at 184.  Specifically, Scott proposed "changing the[] nursery to a preschool," (Compl. Ex. 3 at 2), but the reboot kept the nursery setting, (*see, e.g.*, RJN, Ex. B-1 (reboot Season 1, Ep. 1) at 1:12-3:57).

1    Scott proposed renaming the Nanny character to "Franny"—another idea which was

2    not used in the reboot—and casting a "younger, hipper female voice like Selena

3    Gomez, Taylor Swift, [or] Daisy Ridley," well-known pop stars and *Star Wars* starlet

4    in their twenties, none of whom voiced Nanny in the reboot.  (Compl., Ex. 3 at 3.)

5         The only purportedly new and different idea that Scott has left—his alleged

6    suggestion that "the Nanny character's socks change in different episodes," (Compl.

7    ¶ 24)—is far too "meager and fragmentary" an element of the *Muppet Babies* reboot to

8    establish substantial similarity between his pitch and the reboot.  *See, e.g.*, *VMG*

9    *Salsoul, LLC v. Ciccone*, 824 F.3d 871, 878 (9th Cir. 2016) (citation omitted).  And in

10   any event, Scott has failed to allege any facts demonstrating that Disney drew the

11   element from alleged discussions with Scott in 2016 rather from its "own ideas or

12   ideas from other sources."  *Spinner,* 215 Cal. App. 4th at 184.

13              **4.    Scott's Implied-Contract Claim Is Time-Barred.**

14        In addition to failing on its merits, Scott's implied-contract claim fails because

15   he did not assert it within two years of its accrual.  *See* Cal. Civ. Proc. Code § 339(1)

16   (providing that any "action upon a contract, obligation or liability not founded upon an

17   instrument of writing" must be filed "[w]ithin two years").  A *Desny* claim accrues,

18   and the statute of limitations begins to run, on the date the defendant first discloses the

19   plaintiff's idea to "a substantial segment of the public."  *Benay*, 607 F.3d at 633 (citing

20   4 Nimmer on Copyright § 19D.07[D]).

21        Because Scott filed this lawsuit on October 22, 2020, and accounting for the

22   tolling agreement that ran from January 31 to September 4, 2020, Scott may recover on

23   his *Desny* claim only if it accrued on or after March 20, 2018.  But Disney disclosed to

24   the public many of the ideas Scott allegedly shared with it for a *Muppet Babies*

25   reboot—and Scott's claim therefore accrued—well before then.  No later than October

26   2016, it was public knowledge that a computer-animated *Muppet Babies* reboot was set

27   to air on Disney Junior in 2018.  (*See* RJN, Exs. C-1 – C-4.)  And by February 2018,

28   mainstream, industry, and fan-based media sources had reported that Jenny Slate (an

-23-

indie actress in her 30s) would voice the Nanny character; that the reboot would be "[s]et in the vibrant playroom of an urban brownstone with an expansive backyard"; and that the new series would feature fantasies "told from the babies' perspective" to "encourage creative thinking and imagination," (*Id.,* Exs. C-5 – C-11, D-6).  Disney itself, moreover, promoted the reboot extensively before March 20, 2018, including by publishing a teaser on YouTube in February 2018 exhibiting both the backyard play area and the fantasies referenced in Scott's 2016 pitch document.  (*Id.*, Ex. C-12.)

As a matter of law, these public disclosures of Scott's supposed ideas caused his implied-contract claim to accrue before March 2020.  *See Thompson v. Cal. Brewing Co.,* 191 Cal. App. 2d 506, 510 (1961) (extensive "test" advertising in San Diego and Sacramento triggered statute of limitations on implied-contract claim because it "immediately disclosed the idea to a substantial segment of the public").

### D. <u>Scott's Fraud Claim Is Not Pleaded With Particularity.</u>

Scott's fourth cause of action unsuccessfully asserts "the tort of promissory fraud," in which "a party enters into an agreement without intending to be bound by its terms."  *Hsu v. OZ Optics Ltd.*, 211 F.R.D. 615, 620 (N.D. Cal. 2002).  The claim fails to satisfy Fed. R. Civ. P. 9(b)'s requirement that a party alleging promissory fraud "state with particularity the circumstances constituting fraud or mistake."  *Id.*  The rule requires "point[ing] to facts which show that [the] defendant harbored an intention not to be bound by [the] terms of the contract at formation."  *UMG Recordings, Inc. v. Glob. Eagle Ent., Inc.*, 117 F. Supp. 3d 1092, 1109-10 (C.D. Cal. 2015) (citations omitted).  "[I]ntent not to perform cannot be proved simply by showing a subsequent failure to perform," *id.*, and "[a]llegations … based on information and belief usually do not satisfy" the standard, *Muriu v. W. Coast Life Ins. Co.*, 2017 WL 10592124, at *4 (C.D. Cal. May 25, 2017) (citations omitted).

Scott's fraud claim does not come close to meeting Rule 9(b)'s high standard. For one thing, the crux of Scott's fraud theory—that Disney executives knew and concealed that Disney was gearing up to produce a *Muppet Babies* reboot and "had no

1    intention of offering Scott an opportunity to work on the reboot or pay him for his

2    ideas," (Compl. ¶ 49)—rests wholly, and impermissibly, on information and belief,

3    and Scott fails to articulate "the facts on which th[at] belief is founded."  *Muriu*, 2017

4    WL 10592124, at *4 (citation omitted).  He also makes no effort to plead any details

5    supporting his theory that the Disney executives with whom he allegedly spoke in

6    early 2016 furtively "harbored an intention not to be bound by [the] terms" of

7    whatever contract they purportedly formed with Scott—other than, perhaps, Disney's

8    alleged failure to perform under that contract, which does not suffice.  *UMG*, 117 F.

9    Supp. 3d at 1109-10.  These threadbare allegations cannot bootstrap what Scott alleges

10   was a mere failure to perform into full-blown fraud, *id.* at 1109, and are precisely the

11   kind of unsupported innuendo of fraudulent intent that Rule 9(b) condemns.  *Vess v.*

12   *Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003).

13   **V.    CONCLUSION**

14        For the foregoing reasons, Defendant The Walt Disney Company requests that

15   this Court dismiss the Complaint for lack of subject-matter jurisdiction under Fed. R.

16   Civ. P. 12(b)(1) or, in the alternative, dismiss each of Scott's claims with prejudice

17   under Fed. R. Civ. P. 12(b)(6).

18

19   DATED:  January 27, 2021          MUNGER, TOLLES & OLSON LLP
                                        ERIN J. COX
20                                      MARK R. YOHALEM
21                                      BRANDON E. MARTINEZ

22

23                            By:   _____*/s/ Erin J. Cox*_____
24                                        *Erin J. Cox*

25                            Attorneys for The Walt Disney Company

26

27

28

DEFENDANT THE WALT DISNEY COMPANY'S MOT. TO DISMISS UNDER FED. R. CIV. P. 12(b)(1) & 12(b)(6)