KING, HOLMES, PATERNO & SORIANO, LLP
HOWARD E. KING, ESQ., STATE BAR NO. 77012
STEPHEN D. ROTHSCHILD, ESQ., STATE BAR NO. 132514
SROTHSCHILD@KHPSLAW.COM
1900 AVENUE OF THE STARS, TWENTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90067-4506
TELEPHONE:   (310) 282-8989
FACSIMILE:   (310) 282-8903

Attorneys for Plaintiff Jeffrey Scott

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| JEFFREY SCOTT, an individual,<br><br>        Plaintiff,<br><br>    vs.<br><br>THE WALT DISNEY COMPANY, a Delaware corporation; and DOES 1 through 10, inclusive,<br><br>        Defendants. | CASE NO. 2:20-CV-09709-SB-SK<br><br>PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COMPLAINT UNDER FED.R.CIV.P. 12(b)(1) AND 12(b)(6); MEMORANDUM OF POINTS AND AUTHORITIES<br><br>[Filed concurrently with declarations of Jeffrey Scott, Jeffrey Hagen and Stephen D. Rothschild]<br><br>Date:    March 26, 2021<br>Time:    8:30 a.m.<br>Ctrm:   6C<br><br>Action Filed:   October 22, 2020 |

Plaintiff Jeffrey Scott ("Scott") respectfully submits the following memorandum of points and authorities in opposition to the motion of The Walt Disney Company ("Disney") to dismiss Scott's complaint pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6).

/ / /

/ / /

/ / /

5395.060/1662818.1

# **TABLE OF CONTENTS**

**Page**

I. INTRODUCTION .................................................................. 1

II. STATEMENT OF FACTS ...................................................... 3

III. STANDARDS ...................................................................... 3

IV. THE BIBLE WAS AN AUTHORIZED DERIVATIVE WORK, THE COPYRIGHT IN WHICH VESTED IN SCOTT BY OPERATION OF LAW, AND NOT A WORK FOR HIRE ............................................ 3

    A. Scott's Copyright in the Bible Vested by Operation of Law Because Henson Authorized Him to Create It .................................. 4

    B. The Elements of the Bible that Scott Created Independently Would Be Subject to Copyright Protection Even if the Bible Were an Unauthorized Derivative Work ........................................ 5

    C. Scott Retained His Copyright Because There Was No Writing Transferring It ........................................................................ 5

    D. Henson's and Disney's Own Copyright Registrations Show that They Understood that They Did Not Own Scott's Scripts .................. 6

    E. The Marvel/Henson Agreement Is Irrelevant to Scott's Standing ......... 7

V. JUDICIAL ESTOPPEL DOES NOT APPLY BECAUSE SCOTT DID NOT CONCEAL ASSETS AND BECAUSE, IF HE SHOULD HAVE LISTED THE BIBLE WITH MORE PARTICULARITY, HIS FAILURE TO DO SO WAS NOT INTENTIONAL .................................... 8

    A. Scott Adequately Disclosed the Bible in His 2003 Bankruptcy Schedules ................................................................................ 8

    B. If Scott's General Description in His Bankruptcy Schedules Was Insufficient, Judicial Estoppel Does Not Apply Because It Was an Innocent Mistake ........................................................... 9

    C. Scott's Contract with Marvel Was Not a Schedulable Asset ............. 11

VI. THE BIBLE CONTAINS INDEPENDENTLY PROTECTIBLE ELEMENTS ...................................................................... 12

VII. THE REBOOT IS SUBSTANTIALLY SIMILAR TO THE BIBLE UNDER THE EXTRINSIC TEST THAT APPLIES ON A MOTION TO DISMISS .................................................................... 14

VIII. THE PARTIES EXECUTED THE MARVEL AGREEMENT BY PERFORMANCE ............................................................... 15

IX. SCOTT HAS PLEADED CIRCUMSTANCES THAT GIVE RISE TO AN IMPLIED CONTRACT TO COMPENSATE HIM FOR HIS IDEAS ............................................................................... 15

X.    SCOTT HAS PLEADED A CLAIM FOR FRAUD.................................... 16

XI.   CONCLUSION ......................................................................... 17

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

King, Holmes,
Paterno &
Soriano, LLP

1

# **TABLE OF AUTHORITIES**

2

**Page**

3

## **FEDERAL CASES**

*ABS Entertainment, Inc. v. CBS Corporation*,
    908 F.3d 405 (9th Cir. 2018)...................................................................13

*Alfred v. Walt Disney Company*,
    821 Fed.Appx. 727(9th Cir. 2020).........................................................13

*Benay v. Warner Bros. Ent.*,
    607 F.3d 620 (9th Cir. 2010)...................................................................14

*Beric v. Crichton*,
    761 F.2d 1289 (9th Cir. 1985).................................................................14

*Binder v. Aetna Life Ins. Co.*,
    75 Cal.App.4th 832 (1999).......................................................................15

*Burnes v. Pemco Aeroplex, Inc.*,
    291 F.3d 1782..............................................................................................9

*Cusano v. Klein*,
    264 F.3d 236 (9th Cir. 2001)...............................................................8, 9

*Daniels v. Walt Disney Co.*,
    958 F.3d 767.............................................................................................15

*DC Comics v. Towle*,
    802 F.3d 1012 (9th Cir. 1289).................................................................14

*Effects Associates, Inc. v. Cohen*,
    908 F.2d 555 (9th Cir. 1990).....................................................................5

*Feist v. Durham*,
    630 F.2d at 909.........................................................................................12

*Funky Films, Inc. v. Time Warner Ent. Co.*,
    462 F.3d 1072 (9th Cir. 2006).................................................................14

*Gunther-Wahl Productions, Inc. v. Mattel, Inc.*,
    104 Cal.App.4th 27...................................................................................15

*In re Norquist*,
    443 B.K. 224 (E.D.Bktcy. WA 1984).....................................................11

*Landsted Homes, Inc. v. Sherman*,
    305 F.Supp.2d 976 (W.D.WI 2002)..........................................................7

*Mahavisno v. Compendia Bioscience, Inc.*,
    2015 WL 248798 *9....................................................................................4

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

King, Holmes,
Paterno &
Soriano, LLP

*McCormick v. Sony Pictures Entertainment,*
    2008 WL 11336160 *5 (C.D.CA 2008) ..................................... 14

*New Hampshire v. Maine,*
    532 U.S. 742, 750 ............................................................................ 9

*Rose v. Beverly Health & Rehabilitation Services, Inc.,* 295
    Fed.Appx. 142 (9th Cir. 2008)....................................................... 10

*Schrock v. Learning Center Curve Intern., Inc.,*
    586 F.3d 513 (9th Cir. 2009) ......................................................... 4

*Shame on You Prods. v. Banks,*
    120 F.Supp.3d 1123 ...................................................................... 14

*U.S. Auto Parts, Inc. v. Parts Geek LLC,*
    692 F.3d 1009................................................................................. 12

*U.S. v. Corinthian Colleges,*
    655 F.3d 984 (9th Cir. 2011).......................................................... 3

*Voss v. Knotts,*
    2012 WL 12846092 (C.D.CA 2012) ............................................. 10

*Wolf v. Travolta,*
    2016 WL 3150552 * 17 (CD CA 2016) ......................................... 5

KING, HOLMES,
PATERNO &
SORIANO, LLP

5395.060/1662818.1

iv

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.    INTRODUCTION

3        Continuing to disregard Scott's contractual rights and copyrights, and

4  continuing to exploit the ideas he presented while, unbeknownst to Scott, it was

5  already developing the *Muppet Babies* Reboot (the "Reboot"), which is in its third

6  season, Disney now asserts a kitchen sink full of erroneous technical arguments in a

7  transparent effort to avoid having to address the facts and evidence and pay for what

8  it indisputably took from Scott.

9        Disney's arguments selectively omit relevant facts and allegations and ignore

10  essential rules of law, and none of them have merit.

11        First, Disney's standing/"work for hire" argument ignores that (a) Henson

12  authorized creation of the original *Muppet Babies* series bible (the "Bible")—the

13  blueprint for the show; (b) the copyright in the Bible vested in its author, Scott, by

14  operation of law when Scott created it; (c) there is no writing transferring Scott's

15  copyright to Disney's predecessor, Marvel Productions, Inc. ("Marvel"), as required

16  under the Copyright Act to transfer a copyright interest; and (d) that, if Henson's

17  consent to the terms under which Scott worked were required (and Disney cites no

18  case showing that it was), Disney had apparent authority to act on Henson's behalf.

19        Second, Disney's bankruptcy argument ignores that Scott's bankruptcy

20  schedules complied with applicable requirements by listing story ideas and other

21  intellectual property in a manner sufficient to allow the bankruptcy trustee to

22  identify specific assets; that the Bible (and Scott's scripts) had no value and no

23  prospect of value in 2003, when Scott was in bankruptcy, because the original

24  *Muppet Babies* had long ceased production; and that Scott's claims did not arise

25  until fifteen years later, when Disney released the Reboot—something Scott could

26  not have foreseen.  Moreover, in 2003 Scott was unaware of the intricacies of

27  copyright law and, therefore, that he owned the Bible, so there could not have been

28  any intent to conceal the existence of that copyright as required to find judicial

1  estoppel.  Disney also ignores that, if this Court determines that Scott's work
2  remains in his bankruptcy estate, reopening the bankruptcy so that the trustee can
3  abandon the property is a ministerial matter easily accomplished.

4          Third, Disney's argument, that the Bible is not copyrightable, ignores the
5  myriad original elements that Scott created, which are more than sufficient to pass
6  the "extrinsic" test which this Court must apply at this stage, so that a jury could
7  easily find sufficient originality for the bible to be independently copyrightable.
8  Scott's declaration attaches as Exhibits 2, 3 and 4 comparisons of the Bible with the
9  "story notes" on which Disney relies and with the first four episodes of the Reboot
10 that identifies many of those original elements.  Also worth noting is that many of
11 the ideas contained in the Henson story notes were rejected in favor of Scott's Bible.

12         Fourth, Disney's argument, that Scott's agreement with Marvel did not
13 survive his bankruptcy, is incorrect because the agreement was not an asset in 2003.
14 It had been fully performed to the best of Scott's knowledge and Scott could not
15 have predicted that Disney would produce a reboot fifteen years later.

16         Fifth, the 1990 agreement concerning Scott's writing two episodes was
17 limited expressly to its "subject matter"—the two episodes it covered, and it
18 contained no reference or relevance to the Bible or the episodes that Scott wrote
19 years earlier.  Even if the Court were to consider that agreement, it would need
20 evidence of the circumstances under which it was negotiated and entered into to
21 evaluate its relevance to Scott's claims.

22         Sixth, Disney's argument, that Scott's agreement with Marvel lacked mutual
23 assent, ignores the years of execution by performance on both sides—Scott working
24 for Marvel by writing the Bible and 106 episodes, and Marvel paying him the per-
25 episode fee and a royalty on episodes he did not write.

26         Seventh, Disney's attack on Scott and Disney's implied contract whereby
27 Disney was obligated to pay him for using the ideas he presented in 2016 in the
28 Reboot ignores the clear law that courts look not just at the words actually spoken,

1   but also the circumstances, including Scott's allegations that Disney and Scott both

2   knew that Scott was a professional writer with a history of being paid for his ideas;

3   that Disney (when it acted ethically) paid for ideas it used; and that Disney actually

4   solicited Scott's ideas.

5         Eighth, Disney's claim that the Reboot idea was "equally available" to Disney

6   ignores that that Scott presented specific ideas for the substance of the Reboot that

7   Disney misappropriated, not just the general idea of creating a reboot.

8         Ninth, Disney's attack on Scott's fraud claim ignores that Scott has identified

9   the precise circumstances of the fraud—when it occurred, the individuals who

10   perpetrated it on behalf of Disney, the specific misrepresentations and concealments,

11   and the circumstances demonstrating falsity.

12   **II.     STATEMENT OF FACTS**

13         A copy of the complaint setting forth Scott's allegations (including a copy of

14   the Bible) is attached to the Rothschild Decl. as Exhibit 6.  Additional facts are set

15   forth below as relevant to the issues raised.

16   **III.     STANDARDS**

17         A district court accepts as true the allegations in the complaint when ruling on

18   a 12(b)(1) motion unless it holds an evidentiary hearing.  *McLachlan v. Bell*, 261

19   F.3d 908, 909 (9th Cir. 2001).

20         "Traditionally, courts have viewed with 'disfavor' motions to dismiss under

21   Rule 12(b)(6) because of the lesser role pleadings play in federal practice and the

22   liberal policy re amendment."  *Rutter Group Practice Guide: Federal Civil*

23   *Procedure Before Trial, Calif. & 9th Cir. Editions*, ¶ 9:10 (citations omitted).  The

24   district court may not consider documents beyond the pleadings unless "(1) the

25   complaint refers to the document; (2) the document is central to the plaintiff's claim;

26   and (3) no party questions the authenticity of the document."  *U.S. v. Corinthian*

27   *Colleges, 655 F.3d 984, 999* (9th Cir. 2011) (citations omitted).

28   **IV.     THE BIBLE WAS AN AUTHORIZED DERIVATIVE WORK, THE**

**COPYRIGHT IN WHICH VESTED IN SCOTT BY OPERATION OF LAW, AND NOT A WORK FOR HIRE**

**A.     Scott's Copyright in the Bible Vested by Operation of Law Because Henson Authorized Him to Create It**

Disney ignores the essential distinction between authorization to create a derivative work and copyright ownership.  While an author of a derivative work must have permission to create it, once he has such permission, the copyright in it vests in the author by operation of law.  The Ninth Circuit explained the rule in *Schrock v. Learning Center Curve Intern., Inc.*, 586 F.3d 513, 523 (9th Cir. 2009), as follows:

> … the Act provides that copyright in a derivative work, like copyright in any other work, arises by operation of law once the author's original expression is fixed in a tangible medium. "Copyright protection subsists … in original works of authorship fixed in any tangible medium of expression," 17 U.S.C. § 102(a), and "[t]he subject matter of copyright … includes … derivative works," *id.* § 103(a). "Copyright in a work protected under this title vests initially in the author or authors of the work." 6 Id. § 201(a); see also *Schiller & Schmidt, Inc. v. Nordisco Corp.,* 969 F.2d 410, 413 (7th Cir. 1992) ("The creator of the [intellectual] property is the owner…."). While the author of an original work "may obtain a certificate of copyright, which is 'prima facie evidence' of its validity," *JCW Invs., Inc. v. Novelty, Inc.,* 482 F.3d 910, 915 (7th Cir. 2007), "copyright protection begins at the moment of creation of 'original works of authorship,' " id. at 914. ***This principle applies with equal force to derivative works.***

See also, e.g., *Mahavisno v. Compendia Bioscience, Inc.*, 2015 WL 248798 *9 ("[i]f Plaintiff had authorization to create Oncomine 3.5, his copyright in that work would best automatically by operation of law, barring any other written agreement to the contrary").

Scott's complaint clearly alleges that Henson authorized creation of the Bible, and Disney cannot honestly dispute that it did.  See ¶ 3, Marvel, which was acting on Henson's behalf, obtained Scott's services to create the Bible and afforded him a "Developed for Television by" credit; ¶ 5, Jim Henson wrote Scott in 1986, "Thank

1  you for all you've done for MUPPET BABIES.  I think it's a terrific series—

2  because of you;" and Scott decl., ¶2 and Ex. 1, Henson commented on and accepted

3  his work as it was being performed.

4      Therefore, absent a valid transfer, whether in a work-for-hire agreement or

5  otherwise, the copyright in the Bible vested initially in Scott.[1]

6      **B.    The Elements of the Bible that Scott Created Independently Would
           Be Subject to Copyright Protection Even if the Bible Were an
7           Unauthorized Derivative Work**

8      Even if Henson had not authorized Scott's work, the many elements that he

9  created independently still would be protected by copyright, and Disney would still

10 be liable for copyright infringement for incorporating them into the Reboot.  *Wolf v.*

11 *Travolta*, 2016 WL 3150552 * 17 (CD CA 2016).

12     **C.    Scott Retained His Copyright Because There Was No Writing
           Transferring It**
13

14     A copyright interest can be transferred only by a writing signed by the

15 transferor.  "The rule is really quite simple: If the copyright holder agrees to transfer

16 ownership to another party, that party must get the copyright holder to sign a piece

17 of paper saying so.  It doesn't have to be the Magna Charta; a one-line pro forma

18 statement will do." *Effects Associates, Inc. v. Cohen*, 908 F.2d 555, 557 (9th Cir.

19 1990).

20     In this case, the only writing signed by Scott that Disney identifies is a 1990

21 story person agreement entered into years after Scott wrote the Bible in 1984 and

22 after he stopped regularly writing Muppet Babies episodes in 1986.  The 1990

23 agreement has nothing to do with the Bible (or episodes that Scott wrote earlier).  It

24 contains no reference to them and clearly identifies the only services to which it

25 does pertain:  Scott's services, "on a free-lance basis," "for the two (2) episodes of

26 _____

27 [1] Disney's cases involving lack of authorization to create a derivative work are
   beside the point, because here Henson and its agent/licensee, Marvel, authorized
28 Scott to create the Bible.

1   the animated television Series 'Muppet Babies.'" (Myers Decl., Ex. 3, Storyperson

2   Agreement, ¶ 1.)  All of its terms are prospective, directed at those two episodes.

3   (See ¶ 2, "Storyperson shall write …"; ¶ 3, "Storyperson shall deliver …";

4   "Company shall accord Storyperson screen credit as writer for all two episodic

5   scripts delivered."  In addition, Scott understood that the agreement covered only the

6   two episodes it described, and never understood that it covered his prior work.  For

7   example, there was no discussion of Marvel increasing Scott's compensation for

8   prior episodes for which Scott received less than the $13,500 to the $13,500 for

9   which the 1990 agreement provided for the two episodes it covered.  (Scott decl., ¶

10  6.)

11          Even if there were some doubt as to the ambit of the storyperson agreement, it

12  cannot be resolved without discovery and evidence of the circumstances under

13  which the parties negotiated and entered into it.

14          **D.      Henson's and Disney's Own Copyright Registrations Show that
                They Understood that They Did Not Own Scott's Scripts**

15

16          Henson's and Disney's copyright registrations, Disney's RJN Exs. E-1 to 106,

17  show that they understood they did not own the copyrights to Scott's work.  The

     registrations include the field "Authorship on Application."  On some of the

18  registrations Henson entered the following:

19

20          musical compositions: Henson Associates, Inc., employer
             for hire; all other cinematographic material ***inclu. script***:
21          Marvel Productions, Ltd., employer for hire.

22  (E.g., Ex. E-50, emphasis added.)

23          However, more of the registrations, including the ones recorded most

     contemporaneously with Scott's oral agreement, Exs. E-1 through E-13, and others

24  that Disney recorded much later, omit the script from the Authorship on Application

25  description, stating as follows:

26

27          musical compositions: Henson Associates, Inc., employer
             for hire; all other cinematic material: Marvel Productions,
28          Ltd., employer for hire.

1   A chart showing which registrations purport to include Scott's scripts and
2   which do not is attached as Exhibit 5 to the Rothschild declaration filed herewith.
3   Henson's decision not to include Scott's scripts in the registrations most
4   contemporaneous with the parties' agreement shows that Henson did not consider
5   itself to be the owner of the copyrights in the scripts.  That later Henson and Disney
6   employees also did not include the scripts suggests they found no writing
7   transferring Scott's copyrights.  That some later Henson and Disney employees
8   included the scripts may be the result of a lack of due diligence.  Obviously,
9   discovery is needed to get to the bottom of those inconsistencies.

10   **E.     The Marvel/Henson Agreement Is Irrelevant to Scott's Standing**

11   Disney's argument, that Henson owned the copyrights in the Muppets and,
12   therefore, that Marvel could not authorize Scott to copyright his material, and,
13   therefore, that the Bible was "an unauthorized derivative work," is wrong, because
14   Henson, and Marvel acting on its behalf, authorized Scott's creation of the Bible,
15   and because Scott was not a party to that agreement.  That, according to Disney,
16   Marvel breached its obligations to Henson under that agreement by failing to obtain
17   a copyright assignment from Scott, is irrelevant to Scott's rights.

18   Moreover, even if Marvel's contractual obligation to Henson were at issue,
19   which it is not, Marvel had apparent authority to enter into an agreement whereby
20   Scott retained his copyright in the Bible.  See *Landsted Homes, Inc. v. Sherman*, 305
21   F.Supp.2d 976, 984 (W.D.WI 2002) (question of fact as to whether subcontractor
22   had apparent authority to permit registration of derivative work on behalf of
23   copyright holder); *Gracen v. Bradford Exchange*, 698 F.2d 300, 303 (7th Cir. 1983)
24   (summary judgment reversed because whether licensee had apparent authority to
25   permit creation of derivative work on behalf of plaintiff, which defendant
26   copyrighted, was a question of fact).

27   Apparent authority is established by "(1) acts by the agent or principal
28   justifying belief in the agency; (2) knowledge by the party sought to be held; and (3)

1  reliance consistent with ordinary care." *Ladsted, supra,* 305 F.Supp.2d at 984.  In

2  this case, Marvel negotiated with Scott and accepted his services on behalf of

3  Henson, and Henson was involved in the original production of the *Muppet Babies*,

4  including providing Scott with notes on the Bible and the scripts he wrote and

5  thanking Scott for his work, and Scott was not privy to the agreement between

6  Henson and Marvel.  (Scott Decl., ¶ 3.)  Those facts establish Marvel's apparent

7  authority to act on behalf of Henson.

8  **V.    JUDICIAL ESTOPPEL DOES NOT APPLY BECAUSE SCOTT DID
      NOT CONCEAL ASSETS AND BECAUSE, IF HE SHOULD HAVE**

9  **LISTED THE BIBLE WITH MORE PARTICULARITY, HIS
      FAILURE TO DO SO WAS NOT INTENTIONAL**

10

     **A.    Scott Adequately Disclosed the Bible in His 2003 Bankruptcy**

11  **Schedules**

12  In Schedule B of his 2003 bankruptcy schedule, item 21, "Patents, Copyrights

13  and other Intellectual Property," Scott generally listed "25 Story Ideas."  That

14  listing, although lacking detail, was sufficient to disclose the Bible because it put the

15  bankruptcy trustee on sufficient notice to conduct an investigation to obtain more

16  detail.  Indeed, it was more detailed than similarly situated debtors generally

17  submitted.  (Hagen Decl., ¶¶ 5-6.)

18  For example, in *Cusano v. Klein*, 264 F.3d 236 (9th Cir. 2001), debtor had

19  listed, without detail, "songrights in … Songs written while in the band known as

20  Kiss." *Id.* at 946.  The court held that was a sufficient disclosure, as follows:

21  Cusano's listing was not so defective that it would forestall
        a proper investigation of the asset. …

22

23  The "songrights" asset as described by Cusano can
        reasonably be interpreted to mean copyrights and rights to
        royalty payments for songs written for the band KISS pre-

24  petition. The debtor in *In re Dillon* described a similar
        asset on her bankruptcy schedules as "songwriter's share

25  of songs." 219 B.R. [781]at 783 [D.Tenn. 1998]. Although
        it would have been more helpful for Cusano to break down

26  the description further so that it named songs, albums, and
        dates of and parties to royalty and copyright agreements,

27  ***the additional detail would not have revealed anything
        that was otherwise concealed by the description as it was,***

28  ***which provided inquiry notice to affected parties to seek***

***further detail if they required it.*** Any undervaluation of the "songrights" asset does not impair Cusano's interest in it, because only an express order of revocation after reopening of the bankruptcy case would do so, and that did not occur. [Citation omitted.]

We conclude, therefore, that his listing of the "songrights" asset was a sufficient scheduling of Cusano's interest in his pre-petition compositions, which reverted to him upon confirmation of his plan. …

*Id.* at 946-947.

Scott's listed "story ideas" included *Muppet Babies* material. (See Scott Decl., ¶ 5.) That general description was consistent with bankruptcy practice in the early 2000s and put the bankruptcy trustee on notice sufficient to conduct a further investigation should he have decided to do so. In fact, he did not. (Hagen Decl., ¶¶ 5-6.)

Moreover, no one was prejudiced by the general description, because the Bible was worthless in 2003. Scott could not have exploited it without permission—something he had tried unsuccessfully to obtain from Marvel; *Muppet Babies* had ceased production twelve years earlier in 1991; and his claims for Disney's infringement of the Bible did not arise until fifteen years after the bankruptcy, in 2018. (See Hagen Decl., ¶ 7.)

**B.   If Scott's General Description in His Bankruptcy Schedules Was Insufficient, Judicial Estoppel Does Not Apply Because It Was an Innocent Mistake**

"Judicial estoppel is an equitable doctrine invoked by a court at its discretion." *Ah Quin v. County of Kauai Dept. of Transp.*, 733 F.3d 267, 270 (9th Cir. 2013, citing *New Hampshire v. Maine*, 532 U.S. 742, 750. "The purpose of the doctrine, 'is to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment.'" *Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1782, 1285 (11th Cir. 2002), citing *New Hampshire, supra,* 532 U.S. at 749-50. Therefore, "inconsistencies must be shown to have been calculated to make a mockery of the judicial system." *Burnes*, *supra*,

1    291 F.3d at 1285.  Moreover, "the doctrine of judicial estoppel does not apply when
2    the prior position was taken because of a good faith mistake rather than as part of a
3    scheme to mislead the court." *Burnes*, *supra*, 291 F.3d at 1287 (citations omitted.)

4         In the bankruptcy context, courts may decline to find judicial estoppel when a
5    debtor did not know of a claim when they prepared their bankruptcy schedules,
6    when a debtor had no motive to conceal an unscheduled asset, when the debtor
7    obtained no unfair advantage, and when the integrity of the judicial process is
8    damaged.  *Ah Quin*, *supra*, 733 F.3d at 271-276.

9         For example, in the cases upon which Disney relies, debtors knew of their
10   claims and deliberately failed to schedule them.  See *Voss v.* Knotts, 2012 WL
11   12846092 (C.D.CA 2012) (debtor failed to list a registered copyright seven months
12   after he created it and declared under penalty of perjury that he owned no
13   copyrights); *Rose v. Beverly Health & Rehabilitation Services, Inc.*, 295 Fed.Appx.
14   142, 144 (9th Cir. 2008) ("[a]t the time she filed for bankruptcy, Rose knew the facts
15   giving rise to her claims and her request for a right to sue letter from the California
16   Department of Fair Employment and Housing demonstrates she knew these claims
17   were potentially valuable.")

18        In this case, Scott did not know that he owned a copyright in the Bible he had
19   written nearly twenty years earlier, that the Bible had any value, or that, fifteen
20   years after his bankruptcy Disney would plunder the Bible in a Reboot without
21   recognizing and paying for his contribution.  He did not know the technical
22   intricacies of the Copyright Act that vested ownership in him by operation of law.
23   He could not exploit the Bible without Henson's or Marvel's consent, which he had
24   tried and failed to obtain years earlier, in 1989.  He had no crystal ball to see into
25   2018, when Disney would create a Reboot and refuse to pay him for his
26   contributions, giving rise to his claims herein.  (Scott Decl., ¶¶ 4-5; see also Hagen
27   Decl., ¶ 7.)  Moreover, the failure to schedule the Bible (or the scripts) had no effect
28   on creditors or the administration of the case because they had no value in 2003.

1   Finally, the story ideas that Scott did schedule gave the Bankruptcy Trustee
2   sufficient information to make further inquiry, which it did not do.  (Hagen Decl., ¶
3   6.)

4          Applying judicial estoppel under the circumstances of this case would violate
5   equitable principles egregiously. *A primary consideration for judicial estoppel is*
6   *that "[p]erversely, the only 'winner' in this scenario is the alleged bad actor in the*
7   *estopped lawsuit*."  (*Ah Quin*, *supra*, 733 F.3d at 276, emphasis added.)  In this case
8   Disney would be the only potential winner.  If the Court were to grant the instant
9   motion, Disney would have a golden ticket to exploit Scott's work with impunity—a
10  clearly unjust and inequitable result.

11         **C.     Scott's Contract with Marvel Was Not a Schedulable Asset**

12         Disney does not state where on Scott's bankruptcy schedules Scott should
13  have listed his agreement with Marvel or provide any meaningful analysis as to why
14  it should have been scheduled.  Although debtors have an obligation to schedule
15  executory contracts, there is no rule requiring them to schedule fully performed
16  contracts with no existing value.  Scott had no reason to believe that the Marvel
17  agreement remained executory or had any continuing value and, in 2003, it did not.
18  (Scott Decl., ¶¶ 4-5.)

19          "[A]n executory contract as one 'under which the obligations of both the
20  bankrupt and the other party to the contract are so far unperformed that the failure of
21  either to complete performance would constitute a material breach excusing
22  performance of the other.'"  *In re Norquist*, 443 B.K. 224, 225 (E.D.Bktcy. WA
23  1984).

24         In 2003, *Muppet Babies* had been out of production for more than ten years.
25  Scott had been paid for all of the scripts he wrote and for the Bible, and had received
26  all of the royalties that Marvel agreed to pay him.  No further performance was
27  required on either side.  It was not until 2018, fifteen years later, that Disney, having
28  acquired Marvel in 2009, decided to re-start the show—something that Scott could

1   not have predicted in 2003.  Obviously, Scott had no duty to schedule claims for

2   breaches of an agreement that did not occur until 15 years later.  Therefore, there

3   was no reason to schedule Scott's agreement with Marvel, and there can be no

4   judicial estoppel.

## VI.   THE BIBLE CONTAINS INDEPENDENTLY PROTECTIBLE ELEMENTS

7        The test for whether a derivative work is independently protectible is as

8   follows:

> In order to be copyrightable, (1) the original aspects of a
> derivative work must be more than trivial and (2) the
> original aspects of a derivative work must reflect the
> degree to which it relies on preexisting material and must
> not in any way affect the scope of any copyright protection
> in that preexisting material. … This … test two ways of
> asking the same underlying question: whether the
> derivative work meets the constitutional requirement of
> originality … to qualify for copyright protection, a work
> must be original to the author, meaning that the work was
> independently created by the author (as opposed to copied
> from other works), and that it possesses the minimal
> degree of independent creativity required by *Feist v.
> Durham*, 630 F.2d at 909.  The second prong asks whether
> the author of the derivative work made so few changes to
> the preexisting work that issuing a copyright for the
> derivative work would prevent the owner of the
> preexisting work from exercising some of its rights under
> copyright law.

19       *U.S. Auto Parts, Inc. v. Parts Geek LLC*, 692 F.3d 1009, 1016-17 (citations

20  and internal quotes omitted).[2]

21       The test for originality to which the court referred in *Parts Geek* is that a

22  derivative work must not consist of actual copying.  This test of originality, which

23  has been aptly characterized as 'modest,' 'minimal,' and as establishing a 'low

24  threshold,' is the *sine qua non* of copyrightability."  *Durham Industries, Inc. v.*

---

26  [2] In *Parts Geek*, there was a question of fact whether the derivative work was a work
27  for hire, because the author was an employee of the holder of the copyright in the
    underlying work.  In the case at bar Scott was not an employee of Henson or
28  Marvel, so the writing requirement discussed above applies.

1   *Tomy Corp.*, 630 F.2d 905, 910 (2nd Cir. 1980).  Moreover, "even when individual
2   elements are not protected – their original selection, coordination and arrangement
3   … may be protectible expression.  *Alfred v. Walt Disney Company*, 821 Fed.Appx.
4   727, 729 (9th Cir. 2020).  See also *ABS Entertainment, Inc. v. CBS Corporation*, 908
5   F.3d 405, 422 (9th Cir. 2018) ("the threshold of creativity for copyright eligibility
6   often is characterized as minimal, and … the courts police the amount of creativity
7   only within the narrowest and most obvious limits" (citation and internal quotes
8   omitted).

9          Many of the new elements in Scott's Bible are described in Exhibits 2, 3 and
10  4 to his declaration, which are comparisons of the Bible to the March 10, 1984,
11  meeting notes attached as Exhibit B to the declaration of Alexander Myers and to
12  the first four episodes of the Reboot.  Scott's Bible contained myriad elements that
13  were not in the pre-existing adult Muppets or the less-than-four minute scene in
14  *Muppets Take Manhattan* on which Disney relies, or with respect to the adult
15  Muppets.  Those elements included, but were not limited to, the show's nursery
16  setting, the child versions of the characters, the mix of entertainment and education,
17  and the blueprint for its stories.  Scott created, developed and refined character
18  traits, running gags associated with each character, and the characters' relationships
19  with each other.  Scott also developed an entirely new character, Nanny, creating
20  personality and other attributes, including the prominent use of her distinctive
21  colored socks, which were and remain integral to the series, and that she was a
22  normal woman.  Scott's Bible defined the nursery environment in which each
23  episode takes place; created show structures incorporating fantasies and adventures
24  that spring from the characters' imaginations and start in the nursery in unique ways,
25  often taking them to new environments in their imaginations; added the use of live
26  action footage and photographs; and created how the show used music.  Scott
27  created the pacing of *Muppet Babies*, how animation and backgrounds were used,
28  the use of everyday objects to launch storylines and fantasies, that the characters

1  would use language and not baby sounds, the modes of interaction among the

2  characters, and many other original elements.  None of those elements existed

3  before.  .

4      Finally, Scott's elements were far more than scènes à faire or general plot

5  ideas or scenes that flow naturally from a basic plot premise, as was the case in

6  *Beric v. Crichton*, 761 F.2d 1289 (9th Cir. 1985).  Nor were they trivial, as were the

7  purportedly unique aspects of the Batmobile in *DC Comics v. Towle*, 802 F.3d 1012

8  (9th Cir. 1289).

9  **VII.  THE REBOOT IS SUBSTANTIALLY SIMILAR TO THE BIBLE**
   **UNDER THE EXTRINSIC TEST THAT APPLIES ON A MOTION TO**
10 **DISMISS**

11     In determining similarity on a motion to dismiss, the district court applies the

12 "extrinsic test, i.e., an objective comparison of specific expressive elements."

13 *McCormick v. Sony Pictures Entertainment*, 2008 WL 11336160 *5 (C.D.CA 2008).

14 That test is directed to "articulable similarities between the plot, themes, dialogue,

15 mood, setting, pace, characters, and sequence of events in two works."  *Id.*

16     Exhibit 2 to Scott's declaration is a comparison that highlights many of the

17 Bible elements that Disney lifted and used in the first four episodes of the Reboot.

18 The comparison shows that Disney used Plot ideas, themes, dialogue, pacing,

19 character attributes, and sequencing.  If the Court believes that additional evidence

20 is necessary at the pleading stage of this lawsuit, Scott will provide analysis of

21 additional episodes.

22     The cases that Disney cites for the proposition that the Bible is not protectible

23 are inapposite.  In *Benay v. Warner Bros. Ent.*, 607 F.3d 620, 624 (9th Cir. 2010), a

24 samurai uprising was not a protectible element because it was a historical event.  In

25 *Funky Films, Inc. v. Time Warner Ent. Co.*, 462 F.3d 1072, 1081 (9th Cir. 2006), the

26 two works at issue shared "general plot similarities," not the myriad of particular

27 similarities presented in this case.  In *Shame on You Prods. v. Banks*, 120 F.Supp.3d

28 1123, 1151, the two works shared only basic plot devices.

## VIII. THE PARTIES EXECUTED THE MARVEL AGREEMENT BY PERFORMANCE

Disney's argument, that the parties never mutually assented to the partly oral and partly implied agreement between Scott and Marvel, ignores the following rule:

> Mutual assent may be manifested by written or spoken words, or by conduct. (Restatement, supra, § 19.) "Contracts are often spoken of as express or implied. The distinction involves, however, no difference in legal effect, but lies merely in the mode of manifesting assent .... assent may be manifested by words or other conduct ... intention to make a promise may be manifested in language or by implication from other circumstances, including course of dealing or usage of trade or course of performance."

*Binder v. Aetna Life Ins. Co.*, 75 Cal.App.4th 832, 850 (1999).

Paragraphs 19 and 20 of the Complaint allege that both parties, Marvel and Scott, abided by and performed their agreement, demonstrating mutual assent. In the cases that Disney cites agreements were not reached or performed.

## IX. SCOTT HAS PLEADED CIRCUMSTANCES THAT GIVE RISE TO AN IMPLIED CONTRACT TO COMPENSATE HIM FOR HIS IDEAS

In *Daniels v. Walt Disney Co.*, 958 F.3d 767, 774-75, upon which Disney relies, the Court described plaintiff's allegations as follows:

> Daniels alleges that "she was aware and relied on customs and practices in the entertainment industry when she approached Disney+Pixar about a partnership," and that "Disney+Pixar accepted the disclosure of the ideas in The Moodsters with an expectation that it would have to compensate Daniels and The Moodsters Company if Disney+Pixar used this idea in any television, motion picture, merchandise, or otherwise."

> But we are told no more. Daniels offers only bare allegations, stripped of relevant details that might support her claim for an implied-in-fact contract. No dates are alleged, and no details are provided.

Scott's complaint contains far more than such conclusory allegations. To determine whether an implied contract exists in idea misappropriation cases, courts look at the circumstances, not just what was said. For example, a request for a submission is evidence of an agreement to pay for an idea. *Gunther-Wahl Productions, Inc. v. Mattel, Inc.*, 104 Cal.App.4th 27, 43. Here, Scott alleges that he

1  met with specific named Disney executives at their request, and provided them with

2  his ideas at their request.  (Complaint, ¶¶ 8, 24.)  Moreover, in addition, Scott was a

3  professional writer that Disney's predecessor, Marvel, had paid for his work.  See

4  *Gunter-Wahl*, *supra*, at 62, holding that the relevant circumstances include "that it is

5  reasonably understood that a professional author expects payment of the reasonable

6  value of his material, if used, so the conduct of the producer in accepting it implies a

7  promise to fulfill those reasonable expectations."[3]

8         Disney's remaining idea misappropriation arguments are premature and

9  without merit.  The ideas that Scott presented to Disney at its request in 2016 were

10  not only possibly creating a Reboot, they included detailed ideas for the substance of

11  the Reboot.  The complaint does not allege that those ideas were shared with anyone

12  else.  Whether the ideas were otherwise available to Disney is a question of fact.

13  Whether Disney used them also is a question of fact.  Although Scott should not

14  have to prove his common law implied contract claim at the pleading stage, if the

15  Court wishes him to plead a detailed analysis of how Disney solicited and used his

16  ideas, he can do so.

17         Disney's statute of limitations argument disingenuously presumes that Scott's

18  only idea was to create a Reboot, when, in fact, he presented detailed ideas about the

19  substance of a Reboot. He could not have learned that Disney misappropriated those

20  ideas until he viewed the Reboot, which premiered no earlier than March 23, 2018[4],

21  less than two years before Scott filed the instant action.

22  **X.    SCOTT HAS PLEADED A CLAIM FOR FRAUD**

23         Strangely, Disney argues that Scott has not alleged how Disney's executives

24

25  [3] Scott did not include all of the parties' complete communications in the allegations

26  in his complaint.  If the Court deems the allegations in the complaint insufficient,
    Scott can amend the complaint to include additional evidence of an implied

27  agreement.

28  [4] Muppet Babies (2018 TV series) - Wikipedia

KING, HOLMES,
PATERNO &
SORIANO, LLP

5395.060/1662818.1                                16

1  knew that Disney was gearing up for a Reboot when Scott communicated his ideas
2  to them after attaching page after page of press releases from 2016 about the
3  planned Reboot.  In any event, Scott has alleged that the executives concealed the
4  specific fact that a Reboot was in the works, while at the same time requesting
5  submissions from Scott.  (Complaint, ¶¶ 24, 49.)  It is a fair inference from Scott's
6  allegations and Disney's press releases that the executives knew a Reboot was
7  already in process, failed to disclose that fact to Scott, solicited ideas from him, used
8  those ideas, and then failed to compensate Scott, and that, acting for Disney, they
9  never intended to perform.

10 **XI.   CONCLUSION**

11        For each of the foregoing reasons, Scott respectfully requests that this Court
12 deny the instant motion, in its entirety.  If the Court determines that any portion of
13 the motion justifies granting it in whole or in part, Scott requests leave to amend.  If
14 the Court determines that any of the claims asserted herein remain in Scott's 2003
15 bankruptcy estate, Scott requests that the Court stay the instant action to provide
16 Scott he opportunity to reopen the bankruptcy to address those matters without
17 affecting the timeliness of any of his claims herein.  See Hagen Decl., ¶ 7.

18

19 DATED:     February 19, 2021        KING, HOLMES, PATERNO &
20                                      SORIANO, LLP
21
22                                 By:     */s/ Stephen D. Rothschild*
23                                      HOWARD E. KING
24                                      STEPHEN D. ROTHSCHILD
                                     Attorneys for Plaintiff Jeffrey Scott
25
26
27
28