ERIN J. COX (State Bar No. 267954)
Erin.Cox@mto.com
MARK R. YOHALEM (State Bar No. 243596)
Mark.Yohalem@mto.com
BRANDON E. MARTINEZ (State Bar No. 318749)
Brandon.Martinez@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue
Fiftieth Floor
Los Angeles, California 90071-3426
Telephone:   (213) 683-9100
Facsimile:   (213) 687-3702

Attorneys for Defendant
The Walt Disney Company

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| JEFFREY SCOTT, an individual,<br><br>   Plaintiff,<br><br>  vs.<br><br>THE WALT DISNEY COMPANY, a Delaware corporation; and DOES 1 through 10, inclusive,<br><br>   Defendants. | Case No. 2:20-CV-09709-SB-SK<br><br>**REPLY IN SUPPORT OF DEFENDANT THE WALT DISNEY COMPANY'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT UNDER FED. R. CIV. P. 12(b)(1) AND 12(b)(6)**<br><br>**[Supplemental Request for Judicial Notice filed concurrently herewith]**<br><br>**Judge:** Hon. Stanley Blumenfeld, Jr.<br><br>**Date:** March 26, 2021<br>**Time:** 8:30 A.M.<br>**Place:** Courtroom 6C<br><br>**Action Filing Date:** October 22. 2020 |

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION .................................................................................. 1

II.   RULE 12(b)(1):  THE COURT LACKS JURISDICTION BECAUSE
      SCOTT LACKS STANDING TO BRING HIS COPYRIGHT CLAIM................. 1

      A.    Scott Lacks Standing to Claim a Derivative Work Copyright......................... 1

            1.    Any Authorization Flowing Through Marvel Was Necessarily
                  Limited by the Terms of the Marvel/HA License Agreement.............. 2

            2.    Apparent Authority Principles Do Not Trump the Requirement
                  for Express Consent from the Copyright Holder. ................................ 4

            3.    Jim Henson's Appreciation for Scott's Work Does Not
                  Countermand Express Licensing Terms. ............................................. 5

      B.    Scott Is Estopped From Asserting His Purported Copyright. ........................ 6

            1.    Scott Failed to Disclose the Bible in His 2003 Bankruptcy,
                  Such That Any Copyright Was Retained by the Bankruptcy
                  Estate. ..................................................................................................... 6

            2.    Scott Is Estopped from Reclaiming the Undisclosed Assets............... 7

            a.    Scott Cannot Overcome the Presumption of Estoppel. ...................... 8

            b.    Even Absent Estoppel, Scott Presently Lacks Standing..................... 10

III.  RULE 12(b)(6):  SCOTT'S CLAIMS FAIL AS A MATTER OF LAW. .............. 10

      A.    Scott's Copyright Infringement Claim Fails on Its Merits. ......................... 10

            1.    Any Alleged Copyright in the 1984 Bible Is Unenforceable. ............ 10

            2.    The *Muppet Babies* Reboot Bears No Substantial Similarity to
                  the Protectable Elements of the 1984 Show Bible............................. 11

      B.    Scott's Breach of Contract Claim Fails.......................................................... 12

            1.    Because Scott Failed to Disclose the Marvel Contract in His
                  Bankruptcy, He Is Estopped From Asserting a Claim for
                  Breach. ..................................................................................................... 12

            2.    The 1990 Agreement Superseded Any Alleged 1983 Contract. ........ 12

            3.    Scott's New Theory of a 1980s Contract with Marvel Fails. ............ 13

      C.    Scott's Claim for Breach of Implied Contract Fails. .................................. 13

            1.    Scott's Implied-Contract Claim Is Time-Barred. ............................... 13

-i-

# TABLE OF CONTENTS
### (Continued)

**Page**

2.   Scott's Already Shared Ideas for the Reboot Could Not Be Consideration for an Implied Contract. ................................ 14

3.   Scott Does Not Dispute That the *Muppet Babies* Reboot Lacks Any Substantial Similarity to His 2016 Pitch. ................................ 14

4.   Scott Has Failed to Plead the Formation of an Implied Contract. ...... 14

D.   Scott's Fraud Claim Fails. ................................................. 15

IV.   CONCLUSION ................................................................ 15

1

# TABLE OF AUTHORITIES

2
**Page(s)**

3 **FEDERAL CASES**

4
5 *Ah Quin v. Cnty. of Kauai Dep't of Transp.*,
   733 F.3d 267 (9th Cir. 2013) ........................................................ 8, 9, 12

6
7 *In re Alan Deatley Litig.*,
   2008 WL 4153675 (E.D. Wash. Aug. 29, 2008) ...................................... 9

8 *Aliotti v. R. Dakin & Co.*,
9 831 F.2d 898 (9th Cir. 1987) ....................................................... 15

10 *Bernal v. Paradigm Talent & Literary Agency*,
    788 F. Supp. 2d 1043 (C.D. Cal. 2010) .............................................. 12

11
12 *Bierman v. Int'l Bus. Mach. Corp.*,
    2012 WL 506562 (N.D. Cal. Feb. 15, 2012) .......................................... 7

13
14 *Burnes v. Pemco Aeroplex, Inc.*,
    291 F.3d 1282 (11th Cir. 2002) ...................................................... 8

15
16 *Campbell v. Walt Disney Co.*,
    718 F. Supp. 2d 1108 (N.D. Cal. 2010) ............................................. 11

17 *Carlini v. Paramount Pictures Corp.*,
18 No. 2:19-CV-08306-SB, slip op. (C.D. Cal. Feb. 2, 2021) ........................ 11

19 *Cavalier v. Random House, Inc.*,
    297 F.3d 815 (9th Cir. 2002) .................................................... 11, 12

20
21 *In re Coombs*,
    193 B.R. 557 (Bankr. S.D. Cal. 1996) ................................................ 7

22
23 *Corbello v. Valli*,
    974 F.3d 965 (9th Cir. 2020) ...................................................... 11

24
25 *Cusano v. Klein*,
    264 F.3d 936 (9th Cir. 2001) .................................................... 6, 10

26
27 *Dalley v. Mitchell Rubenstein & Assocs., P.C.*,
    172 F. Supp. 3d 6 (D.D.C. 2016) ................................................... 10

28

REPLY IN SUPPORT OF DEFENDANT THE WALT DISNEY COMPANY'S MOT. TO DISMISS

1
2

**TABLE OF AUTHORITIES**
(Continued)

**Page(s)**

3       *Daniels v. Walt Disney Co.*,
4            958 F.3d 767 (9th Cir. 2020) ........................................................................ 15

5       *DC Comics v. Towle*,
6            802 F.3d 1012 (9th Cir. 2015) ..................................................................... 11

7       *In re Downey*,
8            242 B.R. 5 (Bankr. D. Idaho 1999).................................................................7

9       *Eastman v. Union Pac. R.R. Co.*,
            493 F.3d 1151 (10th Cir. 2007) .................................................................... 10
10
11      *Figy v. Frito-Lay N. Am., Inc.*,
            67 F. Supp. 3d 1075 (N.D. Cal. 2014) ............................................................2
12
13      *Gardner v. Nike, Inc.*,
            279 F.3d 774 (9th Cir. 2002) ..........................................................................2
14
15      *Gilliam v. ABC, Inc.*,
            538 F.2d 14 (2d Cir. 1976) .............................................................................3
16
17      *Gracen v. Bradford Exch.*,
            698 F.2d 300 (7th Cir. 1983) ..........................................................................4
18
        *Hay v. First Interstate Bank of Kalispell, N.A.*,
19           978 F.2d 555 (9th Cir. 1992) ......................................................................8, 9
20
        *In re Hoblitzell*,
21           223 B.R. 211 (Bankr. E.D. Cal. 1998).............................................................7
22
        *Jordan-Benel v. Universal City Studios*,
23           2015 WL 9694896 (C.D. Cal. Feb. 13, 2015) .............................................. 15
24
        *In re JZ L.L.C.*,
25           371 B.R. 412 (B.A.P. 9th Cir. 2007) ............................................................ 12
26
        *Liu v. Price Waterhouse LLP*,
27           302 F.3d 749 (7th Cir. 2002) ..........................................................................3
28
        *Miller v. Glenn Miller Prods., Inc.*,
             454 F.3d 975 (9th Cir. 2006) ..........................................................................2

1

**TABLE OF AUTHORITIES**
(Continued)

2

Page(s)

3

*Moses v. Howard Univ. Hosp.*,
    606 F.3d 789 (D.C. Cir. 2010)..................................................................10

4

5

*Nsilu v. Wells Fargo Bank, N.A.*,
    2019 WL 3029107 (C.D. Cal. July 10, 2019)...............................................9

6

7

*Pinkham v. Sara Lee Corp.*,
    983 F.2d 824 (8th Cir. 1992) ....................................................................4

8

9

*PlayMedia Sys., Inc. v. Am. Online, Inc.*,
    171 F. Supp. 2d 1094 (C.D. Cal. 2001) ......................................................2

10

*Quirk v. Sony Pictures Ent. Inc.*,
    2013 WL 1345075 (N.D. Cal. Apr. 2, 2013) ..............................................14

11

12

*Reed v. Nat'l Football League*,
    2015 WL 13333481 (C.D. Cal. Sept. 24, 2015) ..........................................15

13

14

*Robertson v. McNeil-PPC, Inc.*,
    2013 WL 12124098 (C.D. Cal. June 19, 2013).............................................9

15

16

*Robertson v. Qadri*,
    2008 WL 818529 (N.D. Cal. Mar. 25, 2008) ...............................................2

17

18

*Sacramento Cnty. Retired Emps. Ass'n v. Cnty. of Sacramento*,
    975 F. Supp. 2d 1150 (E.D. Cal. 2013) ....................................................13

19

20

*Schrock v. Learning Curve Int'l, Inc.*,
    586 F.3d 513 (7th Cir. 2009) ...............................................................2, 3

21

22

*Scott v. City of Phoenix*,
    2011 WL 3159166 (D. Ariz. July 26, 2011)......................................6, 11, 13

23

24

*Shame On You Prods., Inc. v. Elizabeth Banks*,
    120 F. Supp. 3d 1123 (C.D. Cal. 2015) ....................................................11

25

26

*Simmers v. Nat'l R.R. Passenger Corp.*,
    2020 WL 7059631 (D.D.C. Dec. 2, 2020) .................................................10

27

28

*Skinner v. Louisville Ladder, Inc.*,
    2017 WL 4712069 (C.D. Cal. June 26, 2017).............................................8

1

## TABLE OF AUTHORITIES
### (Continued)

2                                                                                  **Page(s)**

3   *Slater v. U.S. Steel Corp.*,
4       871 F.3d 1174 (11th Cir. 2017) (en banc) ................................................ 8

5   *Sobhani v. @Radical.Media Inc.*,
6       257 F. Supp. 2d 1234 (C.D. Cal. 2003) .................................................... 5

7   *S.O.S., Inc. v. Payday, Inc.*,
        886 F.2d 1081 (9th Cir. 1989) ................................................................... 4

8   *Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*,
9       802 F. Supp. 2d 1125 (C.D. Cal. 2011) .................................................... 6

10  *In re Thruston*,
11      2014 WL 2004384 (Bankr. D. Ariz. May 13, 2014) ................................ 7

12  *U.S. Auto Parts Network, Inc. v. Parts Geek, LLC*,
13      692 F.3d 1009 (9th Cir. 2012) ............................................................... 10

14  *UMG Recordings, Inc. v. Glob. Eagle Ent., Inc.*,
15      117 F. Supp. 3d 1092 (C.D. Cal. 2015) .................................................. 15

16  *Voss v. Knotts*,
        2012 WL 12846092 (S.D. Cal. May 29, 2012) ................................. 7, 10, 12
17

18  *Wolf v. Travolta*,
        2016 WL 3150552 (C.D. Cal. Feb. 4, 2016) ............................................ 6
19

**STATE CASES**
20

21  *Associated Creditors' Agency v. Davis*,
        13 Cal. 3d 374 (1975) ............................................................................... 5
22

23  *Gunther-Wahl Productions, Inc. v. Mattel, Inc.*,
        104 Cal. App. 4th 27 (2002) .................................................................. 15
24

**FEDERAL STATUTES**
25

26  17 U.S.C. § 204(a) ....................................................................................... 3

**STATE RULES**
27

28  Fed. R. Civ. P. 12(b)(1) .......................................................................... 1, 15

-vi-

1

## <u>TABLE OF AUTHORITIES</u>
### (Continued)

2                                                                                    **<u>Page(s)</u>**

3  Fed. R. Civ. P. 12(b)(6)............................................................................. 1, 10, 15

4

**OTHER AUTHORITIES**

5

1 Nimmer on Copyright § 3.06 ............................................................................ 3

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.   **INTRODUCTION**

In teaming up with Marvel Productions ("Marvel") to produce *Muppet Babies,* Jim Henson's company, Henson Associates ("HA"), took care to dictate in their license agreement that Marvel could engage personnel only on a work-for-hire basis and that HA retained the copyright in any work Marvel or its hires created. Thus, Marvel could not have hired Jeffrey Scott on the terms he claims, and he could not possess the copyright interest he asserts. Scott argues Marvel—via its apparent authority—could still give away HA's exclusive right to create derivative works, such that Scott can now preclude HA's successor copyright owner (Disney) from creating its own work. But that is contrary to controlling precedent and sound policy. A licensee cannot give away a copyright interest it does not have. Further, Scott admits he did not believe that Marvel gave him any copyright interest to begin with, so the argument fails factually as well.

Even if Scott *ever* had owned a copyright in the 1984 show bible, his failure to schedule it as an asset in his subsequent bankruptcies means that it would still be owned by his bankruptcy estate—not Scott—and he is judicially estopped from claiming otherwise. In response, Scott contradicts himself, first by misquoting his filings to claim he *did* disclose the copyright, then contradictorily claiming he failed to disclose it because he did not know he had it. Whichever of these irreconcilable theories he chooses, neither overcomes the "presumption of deliberate manipulation" that estops him.

As to Disney's Rule 12(b)(6) arguments, Scott's responses are either similarly fanciful or non-existent. His suit must be dismissed.

## II.   **RULE 12(b)(1):  THE COURT LACKS JURISDICTION BECAUSE SCOTT LACKS STANDING TO BRING HIS COPYRIGHT CLAIM.**

### A.   **Scott Lacks Standing to Claim a Derivative Work Copyright.**

Scott concedes that "an author of a derivative work must have permission to create it" (Opp. 4), but insists that he either was sublicensed such authority by Marvel—even though HA's agreement with Marvel did not license Marvel to do so—or that Jim Henson's appreciation for Scott's services afforded Scott a license to create and copyright a derivative work. These theories fail as a matter of law, and the resulting lack of

-1-
REPLY IN SUPPORT OF DEFENDANT THE WALT DISNEY COMPANY'S MOT. TO DISMISS

1    standing on Scott's sole federal claim warrants dismissal of the entire action.[1]

2    **1.    Any Authorization Flowing Through Marvel Was Necessarily Limited by the Terms of the Marvel/HA License Agreement.**

3    Scott contends the Marvel/HA agreement is irrelevant because he was not a party

4    to it, and instead *his* purported agreement with Marvel controls what rights Scott had to

5    use HA's copyrighted material. (Opp. 7.) But "[i]t is well established" that a "copyright

6    licensee may not sub-license his licensed intellectual property rights without express

7    permission from the licensor." *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 988 (9th

8    Cir. 2006); *see also PlayMedia Sys., Inc. v. Am. Online, Inc.*, 171 F. Supp. 2d 1094, 1099

9    (C.D. Cal. 2001) ("Copyright licenses are presumed to prohibit any use not authorized.").

10   The Marvel/HA agreement's terms invalidate any purported license of Scott's

11   because the agreement did not permit Marvel to license HA's copyright for the creation

12   of derivative works. It dictated that "the services to be performed by [Marvel] and all

13   Persons engaged by [Marvel] hereunder and all results and proceeds thereof are works

14   specially ordered"; "all such services, results and proceeds thereof shall be considered a

15   work made for hire"; and "agreements entered into by [Marvel] with a third Person in

16   connection with the Series or any Episode thereof shall so provide." (Myers Decl., Ex. A

17   § 5.1.) In *Gardner v. Nike, Inc.*, 279 F.3d 774 (9th Cir. 2002), a sublicensee of a

18   copyright in a character created by Nike lacked standing to bring an action against Nike

19   to determine its rights. *Id.* at 776-77. Because Nike had not authorized its direct licensee

20   to sublicense the copyright, the sublicense was invalid. *Id.* So too with Scott's claim.

21   Ignoring the Marvel/HA agreement, Scott contends his purported authorization

22   from Marvel afforded him a copyright in the bible by operation of law. (Opp. 4.) Per

23   Scott, "[t]he Ninth Circuit explained the rule in *Schrock v. Learning Center* [sic] *Curve*

24

---

25   [1] Scott contends a "district court accepts as true the allegations in the complaint when
26   ruling on a 12(b)(1) motion unless it holds an evidentiary hearing" (Opp. 3), based on an
     erroneous interpretation of case law that "courts have rejected." *Figy v. Frito-Lay N. Am.,*
27   *Inc.*, 67 F. Supp. 3d 1075, 1085 (N.D. Cal. 2014). Simply put, the "court need not
     presume the truthfulness of the plaintiff's allegations" when "resolving a factual attack on
28   jurisdiction." *Robertson v. Qadri*, 2008 WL 818529, at *3-4 (N.D. Cal. Mar. 25, 2008).

*Intern., Inc.*, 586 F.3d 513, 523 (9th [sic] Cir. 2009)" (Opp. 4)—but *Schrock* is from the Seventh Circuit, not the Ninth. Moreover, Scott ignores the Seventh Circuit's "important proviso" that a sublicensee *cannot* claim a copyright when the "agreement between the [copyright holder and licensee] affirmatively bars the licensee from obtaining copyright protection even in a licensed derivative work." *Schrock*, 586 F.3d at 523-24 (quoting 1 Nimmer on Copyright § 3.06). "[B]ecause the owner of a copyrighted work has the exclusive right to control the preparation of derivative works, the owner could limit the derivative-work author's intellectual-property rights in the contract, license, or agreement that authorized the production of the derivative work" such that the copyright owner "would own the copyright in any derivative" work. *Id*. at 524.

HA did exactly that in its agreement with Marvel, providing that "HA is the Person for whom all work pursuant to this Agreement is and will be prepared"; "that HA shall be considered the author for purposes of copyright and shall own all the rights comprised in and to the copyright of such work and each Episode"; and "that, as between [Marvel] and HA, or any Person engaged by [Marvel], only HA shall own and have the right to copyright the same." (Myers Decl., Ex. A § 5.1 (emphasis added).)[2] That provision controls: "obtaining copyright protection in the derivative work was beyond the scope" of HA's license; thus anyone Marvel engaged "never had any ownership interest in the copyrights in the derivative [works]," and "17 U.S.C. § 204(a) is inapplicable." *Liu v. Price Waterhouse LLP*, 302 F.3d 749, 755 (7th Cir. 2002).

HA's express retention of the copyright in any work applies with equal force to would-be sublicensees who were not party to HA's agreement with Marvel. For instance, when Monty Python licensed BBC to prepare a series based on a copyrighted script and limited BBC's authority to modify the script, BBC's sublicensee (ABC) was found liable for infringement when it edited Monty Python's program—even though ABC's agreement with BBC allowed such editing. *Gilliam v. ABC, Inc.*, 538 F.2d 14, 21 (2d Cir.

---

[2] All copyright registrations for *Muppet Babies* episodes cover all cinematic material, which includes the scripts whether or not the phrase "inclu. script" is used. (*Cf.* Opp. 6.)

1976) (cited approvingly, *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1087-88 (9th Cir. 1989)). "BBC was not entitled to make unilateral changes in the script," and "[s]ince a grantor may not convey greater rights than it owns, BBC's permission to allow [its sublicensee] to edit appears to have been a nullity." *Id.*

### 2. Apparent Authority Principles Do Not Trump the Requirement for Express Consent from the Copyright Holder.

Relying on *Gracen v. Bradford Exchange*, 698 F.2d 300 (7th Cir. 1983), Scott posits that, notwithstanding its lack of actual authority to license his use of HA's copyrighted material, Marvel had *apparent* authority to do so such that it could permit Scott to create a derivative work and then sue HA or its copyright successor for infringement. If *Gracen* so held, that Seventh Circuit decision would be contrary to controlling Ninth Circuit precedent.[3] But, in *Gracen*, the copyright owner and its licensee "d[id] not even argue that [the licensee] had no authority to permit [a sublicensee] to *make* a derivative work," and thus the case did not present "the question … whether [the sublicensee] was licensed to make a derivative work." *Gracen*, 698 F.2d at 303.

Apparent authority cannot even serve as a *defense* against copyright infringement, let alone as a means of depriving the original copyright owner of its rights. For instance, where an alleged infringer believed an author's promoter had licensed use of her book, the infringer's "reliance on the apparent authority defense in general agency law [wa]s misplaced" because, in copyright law, an infringer's "intent is simply not relevant," a principle that "substantially distinguishes copyright law from the areas in which the general agency law doctrine of apparent authority typically is relevant." *Pinkham v. Sara Lee Corp.*, 983 F.2d 824, 829 (8th Cir. 1992). The court noted that the Seventh Circuit's decision suggesting otherwise in "*Gracen* cites no authority for its holding and does not suggest that the holding applies beyond the narrow circumstances of that case." *Id.*

Finally, Scott's apparent-authority theory fails factually, since he himself admits he

---

[3] Scott also cites a decision from Wisconsin that does not offer any reasoned discussion of whether apparent authority could result in a valid sublicense. (*See* Opp. 7.)

did *not* think his arrangement with Marvel let him retain copyright in the 1984 show bible or scripts. Instead, he believed he gave up any copyright (Scott Decl. ¶ 5) and therefore believed he "could not exploit the Bible without Henson's or Marvel's consent." (Opp. 10.) Only *in 2018* did he develop his theory that the purported lack of a written agreement with Marvel prevented his work from being treated as work-for-hire. (Scott Decl. ¶ 5.) Scott thus cannot even show he believed that Marvel had authorized him to create *his own* derivative work, let alone that such belief was reasonable or caused by HA's neglect. *See Associated Creditors' Agency v. Davis*, 13 Cal. 3d 374, 399 (1975).

### 3.   Jim Henson's Appreciation for Scott's Work Does Not Countermand Express Licensing Terms.

In a last-ditch effort to avoid the Marvel/HA agreement's express terms, Scott claims Jim Henson authorized him to develop and copyright the 1984 bible as his own derivative work. (Opp. 4.) But the Complaint is clear that "*Marvel* [not HA or Henson] obtained Scott's services to create a series production bible and write scripts for" *Muppet Babies* and that, "[i]n exchange for the bible, *Marvel* … promised Scott" the perpetual rights he says have been breached. (Compl. ¶¶ 3, 19 (emphases added).)

If Scott's argument is based on Henson's awareness that Marvel had engaged Scott to work on the bible (Scott Decl. ¶ 3), Scott does not dispute Henson's understanding— embodied in the HA license to Marvel—that Scott's work was work-for-hire and that HA retained the copyright. Scott does not even *claim*, let alone try to prove, that Henson's 1986 thank-you note was intended to retroactively override HA's carefully negotiated retention of copyright. This casual courtesy cannot do the work Scott asks of it.

\*          \*          \*

Scott does not dispute that "[n]o jurisdiction permits the author to claim copyright over an unauthorized derivative work 'if the pre-existing work tends to pervade the entire derivative work'" (Mot. 11 (quoting *Sobhani v. @Radical.Media Inc.*, 257 F. Supp. 2d 1234, 1239-40 (C.D. Cal. 2003)), nor does he dispute that the Muppet characters pervade

the 1984 show bible. (*See* Opp. 5.)[4] "Scott does not respond to this argument, and by failing to do so, Scott is deemed to have waived the issue." *Scott v. City of Phoenix*, 2011 WL 3159166, at *10 (D. Ariz. July 26, 2011); *see also Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.,* 802 F. Supp. 2d 1125, 1132 (C.D. Cal. 2011) (collecting cases).

### B.   Scott Is Estopped From Asserting His Purported Copyright.

#### 1.   Scott Failed to Disclose the Bible in His 2003 Bankruptcy, Such That Any Copyright Was Retained by the Bankruptcy Estate.

Scott primarily tries to evade bankruptcy estoppel of his copyright claim by falsely arguing that he *did* "disclose the Bible" in "his 2003 bankruptcy schedule" when he "generally listed '25 Story Ideas.'" (Opp. 8.) But Scott did not "generally list[] '25 Story Ideas'"; the text Scott quotes in his Opposition does not appear anywhere in his bankruptcy filing. Instead, he scheduled "[t]wenty-five television series ideas (fourteen of which are co-owned with others). All have been marketed for sale between 1980 and 2003 without success." (RJN, Ex. A at 13-14.) That these ideas were "marketed for sale … *without success*" excludes *Muppet Babies*, as Disney explained in its Motion. (Mot. 5-6.) Scott has no response but to omit the phrase from his Opposition's false quotation.

The actual text of Scott's bankruptcy schedule defeats any recourse to the sole case he cites, *Cusano v. Klein*, 264 F.3d 936 (9th Cir. 2001). In *Cusano*, the plaintiff listed "songrights in … Songs written while in the band known as 'KISS'" in a Chapter 11 bankruptcy petition; obtained confirmation of a reorganization plan; and then sued KISS for royalties on songs he wrote while a band member. *Id.* at 941-42, 946. He was not estopped because the schedule's description could "reasonably be interpreted to mean copyrights and rights to royalty payments for songs written for the band KISS pre-petition." *Id.* at 946-47. Here, by contrast, no affected party would reasonably interpret show ideas "marketed for sale … without success" to include *Muppet Babies*. Scott's

---

[4] Scott says only that the "elements that he created independently still would be protected by copyright" (Opp. 5), citing a case which confirms that "courts may 'deny copyright to derivative works in which [a] pre-existing work *tends to pervade the entire derivative work.*'" *Wolf v. Travolta*, 2016 WL 3150552, at *17 (C.D. Cal. Feb. 4, 2016).

contrary argument is even more troubling given the declaration he submits from his bankruptcy lawyer, who acknowledges the bankruptcy trustee needed to know about any "intellectual property" with "a proven track record" that had "generated significant income." (Hagen Decl. ¶ 6.) In claiming he slipped a *Muppet Babies* copyright interest past the trustee as a *failed* television pitch, Scott effectively admits he deceived the trustee. (The reality, of course, is that Scott never had a copyright to disclose.)

In a last makeweight argument, Scott pleads for a no-harm-no-foul exception to estoppel, arguing "no one was prejudiced" by his failure to disclose his purported copyright "because the Bible was worthless in 2003." (Opp. 9.) But "even if the debtor thinks the assets are worthless he must nonetheless make full disclosure." *In re Coombs*, 193 B.R. 557, 563 (Bankr. S.D. Cal. 1996). "It is not for the debtors to elect what to disclose"; only *full* disclosure "ensure[s] accurate and dependable information is provided to the Court, trustee, and creditors upon which they can rely without the need for additional inquiry." *In re Downey,* 242 B.R. 5, 13 (Bankr. D. Idaho 1999); *In re Hoblitzell*, 223 B.R. 211, 215 (Bankr. E.D. Cal. 1998) (same). Thus, "lack of injury to creditors [is] irrelevant" to the consequences of incomplete schedules, and Scott's "no harm, no foul argument" fails. *In re Thruston*, 2014 WL 2004384, at *5 (Bankr. D. Ariz. May 13, 2014). Scott and his bankruptcy attorney clearly knew this rule because he scheduled many assets said to be worthless—including, of course, his failed TV ideas.[5]

Because Scott "fail[ed] to properly schedule his alleged copyright asset," it "continues to belong to the bankruptcy estate and did not revert to [Scott]" upon discharge. *Voss v. Knotts*, 2012 WL 12846092, at *2 (S.D. Cal. May 29, 2012); *Bierman v. Int'l Bus. Mach. Corp.*, 2012 WL 506562, at *8 (N.D. Cal. Feb. 15, 2012) ("A debtor lacks standing to later assert any rights based on unscheduled assets."). Thus, Scott lacks standing to pursue his copyright claim—the only hook for federal jurisdiction here.

## 2. Scott Is Estopped from Reclaiming the Undisclosed Assets.

After insisting he scheduled his supposed *Muppet Babies* copyright in bankruptcy,

---

[5] RJN, Ex. A at 10-11, 12 (scheduling assets of "no value" and "value[d] … at $0").

1   Scott pivots to an irreconcilable contention: he "did not know that he owned a copyright
2   in the Bible," so his failure to disclose it was an "innocent mistake." (Opp. 9-10 (caps.
3   amended).) While both of Scott's contentions can be false, they cannot both be true—if
4   he "did not know that he owned a copyright in the Bible" when entering bankruptcy, he
5   cannot have "disclosed the Bible in his 2003 bankruptcy schedules" (*id.* at 8, 10 (caps.
6   amended)). In any event, Scott's claim of good-faith error is irrelevant.

7         Because Scott "has not reopened bankruptcy proceedings" to declare his purported
8   copyright as an asset, and only raised the possibility of doing so after Disney's Motion
9   revealed the consequences, this Court must "apply a presumption of deliberate
10  manipulation," recognizing that "motive to conceal claims from the bankruptcy court
11  is … nearly always present." *Ah Quin v. Cnty. of Kauai Dep't of Transp.*, 733 F.3d 267,
12  271-73 (9th Cir. 2013); *see also, e.g.*, *Skinner v. Louisville Ladder, Inc.*, 2017 WL
13  4712069, at *2 (C.D. Cal. June 26, 2017).[6] As explained below, Scott cannot overcome
14  that presumption—resulting in estoppel and precluding him from ever gaining standing to
15  assert the claim. *See Hay v. First Interstate Bank of Kalispell, N.A.*, 978 F.2d 555, 557
16  (9th Cir. 1992) (debtor judicially estopped from pursuing claim based on failure to
17  disclose). Even if Scott were not estopped, dismissal is still warranted because Scott
18  would not presently own the copyright—his bankruptcy estate would.

19              **a. Scott Cannot Overcome the Presumption of Estoppel.**
20         "[G]iven the strong need for full disclosure in bankruptcy proceedings and the fact
21  that the plaintiff-debtor received an unfair advantage in the bankruptcy court, it makes
22  sense to apply a presumption of deliberate manipulation" where a plaintiff has not
23  already "reopen[ed] bankruptcy proceedings, correct[ed] her initial error, and allow[ed]

24  _____

25  [6] Contrary to Scott's suggestion (*see* Opp. 9-10), the Eleventh Circuit's gloss that a
    plaintiff's "inconsistencies must be shown to have been calculated to make a mockery of
26  the judicial system" to be judicially estopped, *Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d
    1282, 1286 (11th Cir. 2002), *overruled in part by Slater v. U.S. Steel Corp.*, 871 F.3d
27  1174, 1185 (11th Cir. 2017) (en banc), does not apply in the Ninth Circuit. *See Ah Quin*,
    733 F.3d at 272-73 (explaining judicial-estoppel framework for debtor who has not
28  reopened bankruptcy to schedule undisclosed asset).

-8-

1   the bankruptcy court to re-process the bankruptcy with the full and correct information."

2   *Ah Quin*, 733 F.3d at 273. Scott cannot overcome that presumption here.

3       Scott pleads ignorance, contending "[h]e did not know the technical intricacies of

4   the Copyright Act" (Opp. 10), and thus "did not know that [he] owned the copyrights to

5   the bible and the scripts [he] wrote" until 2018. (Scott Decl. ¶ 5.) This contention fails

6   legally and factually. Legally, it is the debtor's "awareness of the factual, not the legal,

7   basis of a claim that triggers [his] duty to list the claim as an asset." *Nsilu v. Wells Fargo*

8   *Bank, N.A.*, 2019 WL 3029107, at *6 (C.D. Cal. July 10, 2019); *In re Alan Deatley Litig.*,

9   2008 WL 4153675, at *15-18 (E.D. Wash. Aug. 29, 2008) (estoppel barred debtor's

10  lawsuit based on undisclosed stake in company because he knew "factual basis for his

11  ownership claim"). And Scott knew the facts about his *Muppet Babies* work when he

12  entered bankruptcy. *See Hay*, 978 F.2d at 557 ("all facts were not known to [plaintiff] at

13  that time, but enough was known to require notification" of asset by debtor).

14      The one consistency among Scott's many, contradictory positions[7] is that they are

15  always aggressive, always seem to vest him with a copyright, and always suited to "the

16  exigencies of the moment"—precisely the mischief judicial estoppel is meant to prevent.

17  *Ah Quin*, 733 F.3d at 270 (citation omitted). Because "[re]opening a bankruptcy is not a

18  means of avoiding … estoppel," *Robertson v. McNeil-PPC, Inc.*, 2013 WL 12124098, at

19  *3 (C.D. Cal. June 19, 2013), Scott's failure to disclose his claimed copyright in 2003

20

---

21  [7] Contrary to Scott's claimed ignorance of copyright law, he was actually an old hand at
22  high-stakes copyright litigation when he navigated bankruptcy. In 1994, an L.A. Superior
    Court civil jury found Scott had falsely claimed exclusive copyright to the *Three Stooges*
23  franchise and falsely denied the existence of contracts governing rights to it. (*See* Suppl.
    RJN, Ex. A at 1-51, Ex. C.) The court ordered Scott and his codefendants to pay over $4
24  million in damages; invalidated their claims to the *Stooges* intellectual property; and
    enjoined them from "[h]olding themselves out" as "owners of any … rights to The Three
25  Stooges including rights to any copyrights." (*Id.*, Ex. A at 45-47, 49.) After this defeat,
26  Scott wrote his licensees, providing his own assessment of the underlying legal issues and
    opining that the Court's copyright ruling was "simply wrong and in many respects
27  blatantly unconstitutional" and defective on technical grounds. (*Id.*, Ex. B at 1.)
28  Ultimately, the judgment led to Scott filing for bankruptcy in 1995. (*Id.*, Ex. C.)

(and, presumably, 1995) bars him from *ever* claiming it for himself. "Allowing [Scott] to 'back up' and benefit from the reopening of his bankruptcy only after his omission had been exposed would suggest that a debtor should consider disclosing potential assets only if he is caught concealing them. This so-called remedy would only diminish the necessary incentive to provide the bankruptcy court with a truthful disclosure of the debtor's assets." *Eastman v. Union Pac. R.R. Co.*, 493 F.3d 1151, 1160 (10th Cir. 2007) (citation omitted); *accord Moses v. Howard Univ. Hosp.*, 606 F.3d 789, 800 (D.C. Cir. 2010).

### b.  Even Absent Estoppel, Scott Presently Lacks Standing.

"For [a plaintiff] to have standing" to assert his copyright claim, "he, rather than the bankruptcy estate, must own the claim upon which he is suing." *Cusano*, 264 F.3d at 945. Because Scott "fail[ed] to properly schedule his alleged copyright asset, the copyright asset continues to belong to the bankruptcy estate and did not revert to" Scott when he was granted a discharge in 2003. *Voss*, 2012 WL 12846092, at *2. Even if Scott were allowed to reopen his bankruptcies and even if the trustees ultimately let him keep the claimed copyright, neither event has happened yet. Currently, Scott lacks standing to pursue his copyright claim, and this Court thus lacks subject-matter jurisdiction, which requires dismissal, not an indeterminate stay for Scott to try to create jurisdiction. *See, e.g.*, *Dalley v. Mitchell Rubenstein & Assocs., P.C.*, 172 F. Supp. 3d 6, 9, 15 (D.D.C. 2016) (dismissing federal claim that debtor failed to disclose in bankruptcy for lack of standing and state-law claim for lack of jurisdiction); *Simmers v. Nat'l R.R. Passenger Corp.*, 2020 WL 7059631, at *3 (D.D.C. Dec. 2, 2020) (dismissing debtor's undisclosed claim for lack of standing without prejudice to trustee "renew[ing] the suit").

### III.  RULE 12(b)(6):  SCOTT'S CLAIMS FAIL AS A MATTER OF LAW.

#### A.  Scott's Copyright Infringement Claim Fails on Its Merits.

##### 1.  Any Alleged Copyright in the 1984 Bible Is Unenforceable.

Scott does not dispute that allowing him a copyright in the *Muppet Babies* show bible would "affect the scope of any copyright protection in [HA's] preexisting material" relating to the Muppets, *U.S. Auto Parts Network, Inc. v. Parts Geek, LLC,* 692 F.3d 1009, 1016 (9th Cir. 2012), and "by failing to do so, Scott is deemed to have waived the

issue," *Scott*, 2011 WL 3159166, at *10. (*See* Mot. 14; Opp. 13.) Scott's claimed contributions—largely subsumed by the Muppets characters and their earlier debut as babies in a nursery in *Muppets Take Manhattan* (Opp. 13-14)—shows why "a derivative work based on a character" likely "could [n]ever" be said not to affect the scope of the underlying copyright. *DC Comics v. Towle*, 802 F.3d 1012, 1025 (9th Cir. 2015).

### 2. The *Muppet Babies* Reboot Bears No Substantial Similarity to the Protectable Elements of the 1984 Show Bible.

Scott's Opposition does not analyze any similarities between the 1984 bible and Disney's reboot, instead citing an attachment to Scott's declaration reflecting his observations of generic similarities. (Opp. 14.) Scott's homemade comparison is largely premised on pre-existing material from *Muppets Take Manhattan* and fails to "filter out and disregard the non-protectable elements." *Cavalier*, 297 F.3d at 822. Scott thus fails to identify "articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events" of the works that constitute protectable expression. *Corbello v. Valli*, 974 F.3d 965, 975 (9th Cir. 2020) (citation omitted).

- **<u>*Characters*</u>:** Scott cannot claim copyright over the Muppets characters or their depiction as babies. The Nanny character, moreover, is one of those "characters which naturally flow from a 'basic plot idea'"—here, a show about babies interacting in a nursery—which "are 'scenes-a-faire' not protected by copyright." *Campbell v. Walt Disney Co.*, 718 F. Supp. 2d 1108, 1115 (N.D. Cal. 2010).

- **<u>*Setting*</u>:** The nursery setting for the reboot was featured in *Muppets Take Manhattan* and plainly is not Scott's to claim. Moreover, a nursery setting is an unprotectable *scene-a-faire* "flow[ing] directly from the basic premise." *Shame On You Prods., Inc. v. Elizabeth Banks*, 120 F. Supp. 3d 1123, 1151-52 (C.D. Cal. 2015). Even the bible refers to the nursery as "generic." (Compl., Ex. 1 at 24.)

- **<u>*Dialogue*</u>:** The only supposed overlap in dialogue Scott identifies is the phrase "Go bye-bye!" (Scott. Decl., Ex. 2 at 8.) This falls far short of the "[e]xtended similarity of dialogue" substantial similarity requires. *Carlini v. Paramount Pictures Corp.*, No. 2:19-CV-08306-SB, slip op. at 22 (C.D. Cal. Feb. 2, 2021) (Blumenfeld, J.).

- **<u>*Theme and Mood*</u>:** Scott does not articulate any similarity in theme or mood and does not dispute that any potential commonalities are generic and unprotectable. *See Cavalier*, 297 F.3d at 828 ("The themes of teaching children to have confidence, to overcome their fears, and to try are not only too general to be protected but are also standard topics in children's literature."); *Shame On You*,

120 F. Supp. 3d at 1158-62 ("A general mood that flows naturally from unprotectable basic plot premises is not entitled to protection.").

- ***Sequence of Events, Pace:*** Scott does not identify any shared sequences of events or pacing—unsurprising given the bible did not contain story narratives that could give rise to such similarities. *Bernal v. Paradigm Talent & Literary Agency*, 788 F. Supp. 2d 1043, 1072 (C.D. Cal. 2010) ("[S]equence of events refers to the actual sequence of the scenes, not just having similar scenes out of sequence").

- ***Plot:*** The vast majority of the purported similarities Scott identifies relate to the reboot's depiction of the Muppet Babies' fantasies (*see* Scott Decl., Ex. 2 at 2-8), but *Muppets Take Manhattan* had already depicted the Muppets as babies engaging in and singing about imaginary adventures. And "the use of 'magical adventures,' a stock plot device, [is not] protect[a]ble." *Cavalier*, 297 F.3d at 828.

### B. Scott's Breach of Contract Claim Fails.

#### 1. Because Scott Failed to Disclose the Marvel Contract in His Bankruptcy, He Is Estopped From Asserting a Claim for Breach.

Scott does not dispute that he failed to list in his bankruptcy schedule his purported 1980s agreement with Marvel, but claims he was not obligated to disclose it because "there is no rule requiring [a debtor] to schedule fully performed contracts with no existing value." (Opp. 11-12.) This is wrong. "*Every* contract to which the debtor is party is encompassed by the scheduling obligation"—even if the debtor is unsure whether the contract is an "asset, liability, or executory." *In re JZ L.L.C.*, 371 B.R. 412, 417 (B.A.P. 9th Cir. 2007) (emphasis added). Scott had to schedule his purported contract with Marvel, even if he believed it to be "fully performed" and not executory. (Opp. 11.) His failure to do so estops him from claiming breach, and the alleged contract remains with the bankruptcy estate. *Ah Quin*, 733 F.3d at 271; *Voss*, 2012 WL 12846092, at *2.

#### 2. The 1990 Agreement Superseded Any Alleged 1983 Contract.

Scott's 1990 contract, in which he agreed to write two *Muppet Babies* episodes for a fixed fee each without any attendant royalty rights, refutes the terms of his claimed agreement with Marvel, particularly the royalty "in perpetuity" and right of first refusal to write all episodes. (Compl. ¶ 19.) Presumably that is why Scott falsely alleges that he "never accepted" Marvel's "proposed draft written agreements," such that "they were never fully executed." (*Id.*) The 1990 contract entitled Scott to write only two *Muppet Babies* scripts (not all such scripts forever) and explicitly provided that $13,500 per script

-12-

was Scott's "applicable compensation," that Marvel was "not obligated to use [Scott's] services," and that the $13,500 fee would "fully discharge" any obligations to Scott. (Myers Decl., Ex. C §§ 2, 5, 7, 15.) The integrated 1990 contract disproves Scott's allegations and superseded any alleged prior agreement about the *Muppet Babies*.

### 3. Scott's New Theory of a 1980s Contract with Marvel Fails.

Scott does not dispute that California law forecloses his theory of a "partly oral and partly in writing" contract with Marvel (*see* Mot. 18-19), waiving any contrary argument, *Scott*, 2011 WL 3159166, at *10. Instead, he tries out a new story for how Marvel provided him rights in perpetuity: he and Marvel "executed the Marvel agreement by performance." (Opp. 15 (caps. amended).) This is legally and factually untenable.

"[A] course of conduct may show an implied promise," but "the conduct alleged to provide the implied contract must give rise to the specific understanding sought to be enforced." *Sacramento Cnty. Retired Emps. Ass'n v. Cnty. of Sacramento*, 975 F. Supp. 2d 1150, 1166 (E.D. Cal. 2013). Scott has not alleged, and cannot allege, conduct that would show Marvel intended to give him perpetual royalties and a screenwriting right of first refusal. Far from showing that Marvel granted Scott scriptwriting privileges and royalties in perpetuity, Scott and Marvel's conduct shows the opposite. Scott left *Muppet Babies* after only three seasons, in 1986 (Compl. ¶¶ 5, 20), and before writing any more scripts, he signed a contract, the terms of which *contradict* the alleged informal agreement purportedly ratified by the parties' conduct. (*See* Myers Decl., Ex. C.)

### C. Scott's Claim for Breach of Implied Contract Fails.
#### 1. Scott's Implied-Contract Claim Is Time-Barred.

Scott does not dispute that the statute of limitations on a *Desny* claim begins to run when a defendant's use of a plaintiff's alleged idea is disclosed to a substantial segment of the public. (Mot. 23-24.) And he does not dispute that articles and trailers about the *Muppet Babies* reboot widely publicized the reboot well before March 20, 2018. (*Id.*) Scott argues only that these did not disclose specific ideas for the reboot that he allegedly shared with Disney executives. (Opp. 16-17.) He is wrong. They disclosed that "Nanny" had been cast; that the reboot would be computer-animated; that it would be "[s]et in the

-13-

vibrant playroom of an urban brownstone with an expansive backyard"; and that it would feature fantasies "told from the babies' perspective" to "encourage creative thinking and imagination," of the type Scott referenced in his pitch. (RJN, Exs. C-1 – C-12, D-6.) Scott does not dispute that the public disclosure of these elements triggered the statute of limitations on his implied-contract claim, which thus expired before he filed suit.

### 2. Scott's Already Shared Ideas for the Reboot Could Not Be Consideration for an Implied Contract.

Most of the ideas Scott allegedly shared in his 2016 pitch materials were in the 1984 bible and scripts for the original *Muppet Babies*. (Mot. 21-22.) Scott contends it "is a question of fact" whether his "ideas for the substance of the Reboot … were otherwise available to Disney" (Opp. 16), but there is no dispute of fact as to what was in the 1984 bible and series, the 2016 pitch materials, or the reboot. These materials and the Complaint itself show that Scott's 2016 pitch merely regurgitated elements from the original series and could not be consideration for an implied contract in 2016. *Quirk v. Sony Pictures Ent. Inc.*, 2013 WL 1345075, at *12 (N.D. Cal. Apr. 2, 2013) (plaintiff must "disclos[e] something that is not otherwise freely available to the defendant").

### 3. Scott Does Not Dispute That the *Muppet Babies* Reboot Lacks Any Substantial Similarity to His 2016 Pitch.

Beyond suggesting that "[w]hether Disney used" his alleged ideas "is a question of fact" (Opp. 16), Scott does not contest that any new ideas he allegedly pitched to Disney in 2016 share no substantial similarity to the *Muppet Babies* reboot as a matter of law (*see* Mot. 22-23). The reboot and pitch materials—incorporated into the Complaint and properly before the Court—are not substantially similar. The *Desny* claim thus fails.

### 4. Scott Has Failed to Plead the Formation of an Implied Contract.

Scott's implied-contract theory rests on his allegation that, when he met with Disney executives in 2016, "both sides" understood that, "if Disney used [his] ideas and produced new episodes, it would pay for [his] ideas and honor the commitments that … Marvel, and Jim Henson, made to him." (Compl. ¶ 8.) He pled no details showing the executives were aware of those commitments when they allegedly met with him, let

1  alone *how* they could have been aware of them when, per Scott, he and Marvel "executed

2  the [1983] Marvel agreement by performance." (Opp. 15 (caps. amended).) Scott's

3  allegation that he "was a professional writer" that "Marvel[] had paid for his work" (*id.* at

4  16), does not fill in this gap, instead suggesting he offered his thoughts on a reboot to win

5  a screenwriter's job and thus precluding an implied contract.[8] Scott failed to plead

6  *specific* facts showing Disney knew the terms on which he disclosed his supposed ideas

7  and the ideas' value. *See Daniels v. Walt Disney Co.*, 958 F.3d 767, 775 (9th Cir. 2020);

8  *Reed v. Nat'l Football League*, 2015 WL 13333481, at *3 (C.D. Cal. Sept. 24, 2015).[9]

9          **D. <u>Scott's Fraud Claim Fails.</u>**

10         Scott cannot plead promissory fraud without alleging specific facts showing

11  Disney "harbored an intention not to be bound by terms of the contract at formation."

12  *UMG Recordings, Inc. v. Glob. Eagle Ent., Inc.*, 117 F. Supp. 3d 1092, 1109-10 (C.D.

13  Cal. 2015) (citations omitted). Whether Disney executives told Scott that a reboot was in

14  the works (Opp. 16-17) says nothing about whether they intended to breach their alleged

15  contract with him at the moment of formation. Nor can Scott satisfy this element by

16  alleging Disney failed to pay him. *UMG Recordings*, 117 F. Supp. 3d at 1109 ("[I]ntent

17  not to perform cannot be proved simply by showing a subsequent failure to perform.").

18  **IV.    <u>CONCLUSION</u>**

19         For the foregoing reasons, this Court should dismiss Scott's copyright infringement

20  claim with prejudice for lack of standing and dismiss the action for the resulting lack of

21  subject-matter jurisdiction under Rule 12(b)(1); or, in the alternative, dismiss each of

22  Scott's claims with prejudice under Rule 12(b)(6).

23

24  [8] *Jordan-Benel v. Universal City Studios, Inc.*, 2015 WL 9694896, at *2 (C.D. Cal. Feb.
    13, 2015) (proposed business relationship cannot give rise to implied contract for sale of

25  idea (citing *Aliotti v. R. Dakin & Co.*, 831 F.2d 898, 902 (9th Cir. 1987)).

26  [9] Scott's reliance on *Gunther-Wahl Productions, Inc. v. Mattel, Inc.*, 104 Cal. App. 4th 27
    (2002), is misplaced. The court held only that it was error, "under the particular facts in

27  the case at bench," to instruct a jury that it could disregard evidence that the defendant

28  requested an idea submission. *Id.* at 31, 43. That does not mean that Scott's inclusion of
    such an allegation satisfies the Ninth Circuit's requirements for pleading *Desny* claims.

1    DATED:  March 12, 2021                    MUNGER, TOLLES & OLSON LLP
2                                                   ERIN J. COX
                                                    MARK R. YOHALEM
3                                                   BRANDON E. MARTINEZ
4
5                                              By:    _/s/ Erin J. Cox_____
6                                                      Erin J. Cox
7                                              Attorneys for The Walt Disney Company
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

REPLY IN SUPPORT OF DEFENDANT THE WALT DISNEY COMPANY'S MOT. TO DISMISS

<u>PROOF OF SERVICE</u>

**Jeffrey Scott v. The Walt Disney Company**
**Case No. 2:20-CV-09709-SB-SK**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

      At the time of service, I was over 18 years of age and **not a party to this action**.  I am employed in the County of Los Angeles, State of California.  My business address is 350 South Grand Avenue, Fiftieth Floor, Los Angeles, CA 90071-3426.

      On March 12, 2021, I served true copies of the following document(s) described as **REPLY IN SUPPORT OF DEFENDANT THE WALT DISNEY COMPANY'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT UNDER FED. R. CIV. P. 12(b)(1) AND 12(b)(6)** on the interested parties in this action as follows:

Howard E. King                         Attorneys for Jeffrey Scott
Stephen D. Rothschild
King, Holmes, Paterno & Soriano, LLP
1900 Avenue of the Stars, 25th Floor
Los Angeles, CA 90067

      **BY CM/ECF NOTICE OF ELECTRONIC FILING:**  I electronically filed the document(s) with the Clerk of the Court by using the CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.  Participants in the case who are not registered CM/ECF users will be served by mail or by other means permitted by the court rules.

      I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

      Executed on March 12, 2021, at Los Angeles, California.

/s/ Lisa Y. Smith
Lisa Y. Smith